# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KASON INDUSTRIES, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:24-cv-766 |
| ) | |
| REFRIGERATED SOLUTIONS ) | **DEMAND FOR JURY TRIAL** |
| GROUP LLC; MASTER-BILT ) | |
| PRODUCTS, LLC; NOR-LAKE, ) | |
| INCORPORATED ) | |
| ) | |
| Defendants. ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Kason Industries, Inc. ("Kason" or "Plaintiff"), by and through its undersigned counsel, files this Verified Complaint for trademark counterfeiting and infringement, unfair competition and false designation of origin, common law trademark infringement, deceptive trade practices, breach of contract, and related causes of action, against Refrigerated Solutions Group LLC ("RSG"), Nor-Lake, Incorporated ("Nor-Lake"), and Master-Bilt Products, LLC ("Master-Bilt") (collectively "Defendants"), and alleges as follows:

## I.    RELEVANT BACKGROUND

1.    Since the 1920s, Kason has been and continues to be engaged in the business of developing refrigeration and restaurant equipment hardware in the United States.

2.    Today, Kason is headquartered in Newnan, Georgia, where its facilities include over 300,000 square feet of manufacturing plants and offices. Over the years, Kason has created hundreds of innovative, reliable parts and has grown in size, sophistication, and reputation to become a leading manufacturer of commercial refrigeration and restaurant equipment hardware in the United States.

3.    The commercial refrigeration and restaurant equipment hardware industry into which Kason sells its parts includes at least two types of customers: original equipment manufacturers ("OEMs") and replacement hardware distribution customers. Defendants have been Kason's customers for many years,

1

purchasing Kason parts for use in their commercial refrigeration equipment manufacturing business.

4.     OEMs purchase and incorporate certain hardware, such as door latches or door hinges, into the final products that they manufacture, such as commercial walk-in refrigerators and other restaurant equipment purchased by end-user customers. Defendants have been OEM customers of Kason for many years.

5.     High quality door hardware is used in many industries beyond the restaurant and food service context. Trucking companies, power generation facilities, and laboratories also need durable door hardware. Kason serves these and other businesses outside the food service industry.

6.     Replacement hardware distribution businesses sell hardware components, such as individual door latches and door hinges, directly to equipment owners such as restaurants and other businesses using that hardware, or to repair companies, who need to replace hardware on the finished products they have in use.

7.     Defendants provide hardware components to replacement hardware distributors. Those hardware components can be used on the final products that Defendants manufactured.  Upon information and belief, replacement hardware

distributors also provide hardware components to other OEMs to install on finished

products made by those OEMs.

8.      Door components play a critical role in the integrity of commercial

refrigeration equipment, including walk-in refrigerators. Defendant Nor-Lake

makes this point in its own promotional materials:

> The door is arguably the most vital yet abused part of a walk-in.
> Doors must close completely to keep your walk-in airtight, increase
> energy efficiency, and form an airtight seal against warmer outside
> air.
>
> The three main components on the door support the seal: hinges, door
> closers and gaskets.

Norlake Walk-In Advantages, https://norlake.com/nor-lake-

products/foodservice/products/norlake-walk-in-advantages/ (last visited Oct. 23,

2024).

9.      The critical door components – no matter how well-made – need to be

replaced periodically. Defendant Nor-Lake explains:

> Daily usage in busy foodservice workspaces can be rough on your
> walk in cooler. Walk ins are frequently subjected to abuse that leads
> to a variety of issues[. For example,] frequent door slamming results
> in damaged hinges, closers and handles.

Norlake Walk-In Repair & Refurbishment Brochure (171544), pdf 503185,

https://norlake.com/wp-content/uploads/2021/08/171544-Walk-In-Repair-

Refurbishment-Brochure.pdf; *see also* Master-Bilt Walk-in Repair &

Refurbishment Brochure, https://master-bilt.com/wp-

content/uploads/2021/08/Walk-In-Repair-Refurbishment-Brochure.pdf. Nor-Lake

lists the door closers and hinges as critical elements of its "Dependable

Construction," explaining that "spring-activated door closer and magnetic gasket

[contribute to] a dependable seal," and that its "durable hinges" have features that

"help ensure doors close completely." Nor-Lake Walk Ins Brochure (132819), pdf

1016164, https://norlake.com/wp-content/uploads/2020/07/132819-Walk-Ins-

Brochure.pdf.

10.    Nor-Lake promotes Kason's products in its marketing

communications that discuss the importance of these features.  For example, Nor-

Lake's main brochure pictures a completed door for a walk-in refrigerator or

freezer. All three of the hardware items in the picture – door closer at the top,

hinges on the sides, and door handle – are the Kason items that Kason has supplied

to Defendants for years. The appearance of the door closer and the hinges are

protected by registered trademarks.

11.    The same brochure specifically highlights four features as part of

"The Doorway to Reliability" marketing message. Two of the four – "Deadbolt

Locking Handle" and "Durable Hinges" feature hardware made by Kason. The

appearance of the hinge is protected by a registered trademark.

5

# THE DOORWAY TO RELIABILITY

## Dependable Construction

- Standard doors are infitting and flush-mounted
- Available in 26", 30" and 36" widths
- Cam-lift hinges are spring-loaded for an easy, reliable closure
- Unique field-adjustable hinge backing plates ensure a proper fit of the door to its opening during installation and also allow for any necessary future adjustments
- Spring-activated door closer and magnetic gasket for a dependable seal
- Adjustable double sweep gasket on bottom of door to remove frost build-up on threshold



**Doors can be customized with kickplates and other options to fit your application.**



**Deadbolt Locking Handle**
- Can be independently locked with a key and/or padlock
- Locking mechanism with inside release knob allows for easy exit from walk-in should someone be locked inside
- Entire locking mechanism is on frame portion of door section and will not freeze



**LED Lighting**
- Uses less energy and lasts up to 50,000 hours vs. 1000 hours for incandescent bulbs
- Mounted at the interior top of the door to provide full illumination
- Minimal heat output reduces cooling costs



**Digital Thermometer/ Light Switch**
- Conveniently integrated into one component
- Waterproof "elbow-engaged" illuminated light switch allows user to turn on the light easily, even when hands are full
- Digital display is easy to read in all ambient conditions



**Durable Hinges**
- Field adjustable to compensate for door settling during install or after
- Cam-lift, spring loaded hinges help ensure doors close completely
- Available for either a left- or right-hand opening door

https://norlake.com/wp-content/uploads/2020/07/132819-Walk-Ins-Brochure.pdf at

5 (last accessed on October 28, 2024). See also https://master-bilt.com/wp-

content/uploads/2021/09/Walk-Ins-Brochure.pdf at 5 (last accessed on October 29,

2024).

12.    As detailed below, the 921C deadbolt handle and the 1245 and/or1248

hinges featured in the Nor-Lake marketing materials are two of the items that

Defendants recently copied, despite Kason's intellectual property interests in both

items. The end users and the customers that manage the equipment have the

greatest interaction with the door of a walk-in refrigerator or freezer. Through

those interactions, they form important impressions regarding the quality and

reliability of the Kason parts that have long been installed on the Defendants'

finished products.

13.    Supplying its hardware to replace parts on finished foodservice

equipment parts, such as ice machines, walk-in refrigerators, and hot side heat-and-

hold cabinets and dough proofers, is a major source of revenue for Kason and for

other market participants. The commercial context for these products exposes them

to extreme wear and tear, as noted by Nor-Lake's marketing material quoted

above.  Even high quality mounting parts like hinges and latches eventually wear

out.

6

14.     Kason sells its hardware to OEMs like Defendants at a reduced margin for multiple reasons. For example, handling case quantities of identical items requires less labor intensive and uses less packing material. Kason sells replacement parts at higher prices that yield higher margins, because stocking and delivering those parts, including parts on an individual or low-quantity basis, incurs higher costs in the form of more attention from Kason's staff, more packing material, and similar increases in costs compared to the high-volume OEM parts supplying operations.

15.     Institutional customers, such as restaurant chains, will sometimes source replacement parts in bulk from Kason, or from the OEM that installs Kason parts on its finished products. Others will buy from Kason indirectly by placing orders through Kason's distributors, including the three regional locations in addition to its Georgia headquarters that Kason owns and manages, which also increase costs. A third channel for replacement parts – independent distributors such as Parts Town – also supply Kason replacement parts to institutional customers.

16.     Hinges, handles, and other high-use parts can need replacement multiple times over the life span of the types of refrigerators and freezers that Defendants manufacture. When genuine Kason parts are used to replace the original equipment Kason parts, Kason earns profit from each sale of a genuine

7

Kason replacement part. One sale to the OEM, like Defendants, can be expected to generate a replacement parts income stream over the course of many years to come.

17.    Interrupting this supply chain, either by substituting counterfeit, look-alike non-Kason parts for genuine Kason parts on the finished OEM product, or by selling non-Kason parts to replace hardware that was originally supplied by Kason without disclosing the true manufacturer of the hardware to the purchaser, diverts Kason's expected profits.

18.    OEMs and independent distributors can also earn a larger profit margin if they can buy the non-Kason part at a lower price. These profits can tempt competitors and distributors to cut corners to reduce the cost of each part, and sometimes to compete unfairly and unlawfully.

19.    Defendants and other participants in this market recognize the value of the Kason brand, and the high quality of Kason's parts. In general, Kason offers a one-year warranty on its parts, which is one of the longest warranties in the food service hardware industry. Kason obtains all relevant sanitary and safety certifications for its parts, including NSF and UL certifications, required for use in the foodservice industry. Additional certifications for the finished product, such as the Miami-Dade County hurricane certification, rely on the quality of the genuine Kason parts to achieve the required performance levels. Kason also enforces

8

quality control processes to ensure its parts meet Kason's high standards prior to customer delivery.

20.    Kason has intellectual property rights in its brand name (KASON®) and logos, in certain part designs, in certain product names, and in the part numbers that Kason has used consistently for decades. Kason has used the intellectual property protection tools provided by federal and state laws to maintain its unique market identity.

21.    Kason also invests in maintaining a unique visual identity for its products. Many of Kason's products have distinctive appearances that are recognized by consumers in the food services equipment industry and in other industries requiring such hardware, and by the United States Patent and Trademark Office. Kason currently holds registered trademarks in the appearance of many of its distinctive products.

22.    Citing Kason's high quality standards, customers also ask Kason to design and manufacture custom hardware items, to that customer's specifications.

23.    Throughout its history, Kason has obtained at least 100 U.S. and overseas utility patents to protect its technical innovations. Currently Kason owns dozens of utility patents that are in effect, which Kason practices in a wide range of its products.

24.    Kason has taken steps to control the use of its trademarks and other intellectual property rights over the years, because Kason has the right to control how its parts and the company as a whole are perceived by the purchasers in this market.

25.    Those enforcement steps include requesting others to stop certain unfair or unlawful marketing practices, requiring its authorized distributors to respect Kason's intellectual property while they market Kason's parts, and intervening when third parties seek to improperly copy its trademarks, trade dress marks, and patented technology. At times, and when necessary, Kason has filed lawsuits to protect its rights.

26.    As more fully detailed below, following Defendants' notice to Kason that they had decided to find "secondary sourcing" for certain parts they had purchased from Kason for years, Kason has identified several unfair and deceptive marketing practices by the Defendants that are harming Kason. These acts are attributed to all Defendants because, while it is unclear which Defendant is directing each of these actions, it is apparent that all Defendants have some role in these actions, from associating their brand names with counterfeit parts (Nor-Lake and Master-Bilt) to communicating with Kason about parts purchasing (RSG).

27.    Upon information and belief, the unfair and deceptive practices used by Defendants include at least the following:

a. Selling unauthorized, counterfeit copies of at least four of Kason's parts that are protected by registered trademarks;

b. Selling products that incorporate unauthorized, counterfeit copies of at least four of Kason's parts that are protected by registered trademarks;

c. Using, or allowing others to use, images of genuine Kason products, including the clearly legible KASON® mark stamped into the product, in "bait and switch" sales tactics that result in the delivery of a counterfeit copy of the pictured, genuine Kason product; and

d. Using Kason's trade secret drawings of one of Kason's door lock products to have copies made of that product by a manufacturer other than Kason, in breach of an explicit provision of the non-disclosure agreement Defendant RSG signed in order to receive the drawing.

28.    Upon information and belief, Defendants also are making, using, selling, offering for sale, or importing products that infringe at least one Kason patent. The panel fastener product on the Defendants' list of "dual source" products is covered by at least one U.S. Patent. Because these parts typically are

11

found inside assembled walk-in freezers, Kason has not yet been able to obtain a sample to investigate for infringement.

29.    At least one version of the handle on the Defendants' list of "dual source" products is covered by at least one U.S. patent. Kason has not yet been able to obtain a sample of the Defendants' substitute product to investigate for infringement.

30.    Defendants' acts are not isolated mistakes. They are evidence of a business plan that aims to leverage Kason's goodwill in the marketplace not to sell Kason's parts, but to manufacture, use, and sell unauthorized copies of Kason's parts that are covered by intellectual property protections.

31.    Defendants developed this business plan while they enjoyed the benefits of being a Kason customer. As a Kason customer, Defendants paid reduced prices, enjoyed generous credit terms, received priority turn-around for their orders (often causing Kason to incur overtime expense that Kason absorbed), obtained engineering support at no charge, and, pursuant to a Customer Non-Disclosure Agreement, received copies of CAD models and drawings of Kason's parts to use in incorporating Kason products into Defendants' products. It has become clear that Defendants took everything they know about Kason's parts and used that knowledge to deceive their mutual customer base, and to compete against Kason unfairly, deceptively, and unlawfully.

12

32.    The unfair and deceptive marketing practices that Kason seeks to end are detailed below. Accordingly, in addition to all available monetary damages and compensation, Kason seeks an injunction (1) requiring Defendants to remove counterfeit goods from the stream of commerce, including, but not limited to, preventing any further sales of counterfeited good by either Defendants, its affiliates, Parts Town, or other third party sellers; and (2) prohibiting the adoption of such tactics and practices in the future.

33.    To the extent that paper catalogs, brochures, and other marketing materials also incorporate these unfair and deceptive marketing tactics, Defendants should be enjoined from (1) further distribution of those materials; and (2) using these unfair and deceptive marketing tactics in any future paper catalogs, brochures, or other marketing materials.

## II.    <u>PARTIES</u>

34.    Kason is a Georgia corporation, with its principal place of business at 57 Amlajack Boulevard, Newnan, Georgia 30265.

35.    On information and belief, Defendant Refrigerated Solutions Group LLC is a Delaware limited liability company. RSG is registered with the Mississippi Secretary of State as a fictitious name for Master-Bilt Products, LLC, with a principal place of business at 727 Second Street, Hudson, WI 54016. Per its filing with the Delaware Secretary of State, RSG can be served through its

registered agent, Cogency Global Inc., 850 New Burton Rd. Ste 201, Dover, DE 19904.

36.    On information and belief, Defendant Nor-Lake, Incorporated is a Wisconsin corporation. According to Nor-Lake's March 11, 2024 filing with the Georgia Secretary of State and its corporate records filed at the State of Wisconsin Department of Financial Institutions, its principal place of business is 727 Second Street, Hudson, WI 54016-1515. Per its State of Wisconsin filing, Nor-Lake can be served through its registered agent, Cogency Global, Inc., 100 Wilburn Rd. Ste 100, Sun Prairie, WI 53590.

37.    On information and belief, Defendant Master-Bilt Products, LLC is a Delaware limited liability company. In its filing with the California Secretary of State, Master-Bilt discloses that its principal place of business is 891 County Road U, Hudson, WI 54016. Per its filing with the Delaware Secretary of State, Master-Bilt can be served through its registered agent, Cogency Global Inc., 850 New Burton Rd. Ste. 201, Dover, DE 19904.

38.    On information and belief, RSG owns and/or controls, directly or indirectly, Nor-Lake and Master-Bilt.

## III.    JURISDICTION AND VENUE

39.    This is an action for, inter alia, trademark counterfeiting and infringement, false designation of origin, unfair competition, common law

trademark infringement, breach of contract, and related claims pursuant to 15 U.S.C. §§ 1 *et seq*., including §§ 1114, 1125(a), and for related claims of deceptive trade practices under the laws of the State of Wisconsin.

40.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, and pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a) and (b). This Court has supplemental jurisdiction over Plaintiff's additional claims, pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal trademark infringement and counterfeiting claims, over which this Court has original jurisdiction, that the additional claims form part of the same case or controversy under Article III of the United States Constitution.

41.    This Court has personal jurisdiction over all Defendants because they have places of business within this District. They conduct business with Kason from those places of business, and upon information and belief, counterfeit merchandise is currently in the possession, custody or control of some or all of the Defendants at locations within the District.

42.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), because a substantial part of the events and injury giving rise to Kason's claims has occurred and continues to occur in this district.

## IV.    <u>KASON'S INTELLECTUAL PROPERTY RELEVANT TO THIS ACTION</u>

43.    In 1972, Kason began selling a distinctive hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1245" (the "Kason 1245 Hinge"). The distinctive styling of this hinge later expanded to "sister" hinges (hinges 1246, 1248, and 1249) that incorporate the curved edges and rounded styling of the 1245 hinge.

44.    A photograph of the Kason 1245 Hinge, as currently offered by Kason, is shown below:





(From https://www.kasonind.com/index.php/products/hinges/walk-in/1245-reversible-cam-rise-hinges)

45.    The United States Patent and Trademark Office has recognized the distinctive appearance of the Kason 1245 Hinge as a trademark belonging exclusively to Kason. As such, Kason owns U.S. Trademark Registration No. 2,176,043 (the "'043 Mark"), for the appearance of the Kason 1245 Hinge:



(Image from U.S. Trademark Registration No. 2,176,043)

46.    In 1974, Kason began selling a hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1246" (the "Kason 1246 Hinge"). A photograph of the Kason 1246 Hinge, as currently offered by Kason, is shown below:

17





(From https://www.kasonind.com/index.php/products/hinges/walk-in/1246_reversible_cam_rise_hinge)

47.    The United States Patent and Trademark Office has recognized the distinctive appearance of the Kason 1246 Hinge as a trademark belonging exclusively to Kason. As such, Kason owns U.S. Trademark Registration No. 2,382,322 (the "'322 Mark"), for the appearance of the Kason 1246 Hinge:



(Image from U.S. Trademark Registration No. 2,382,322)

48.    In 1974, Kason began selling a hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1248" (the "Kason 1248 Hinge"). A photograph of the Kason 1248 Hinge, as currently offered by Kason, is shown below:



(From https://www.kasonind.com/index.php/products/hinges/walk-in/1248-spring-assisted-hinge)

19

49.    The appearance of the Kason 1248 Hinge mimics the appearance of the Kason 1245 Hinge, while adding a compatible housing for a spring mechanism.

50.    The United States Patent and Trademark Office has recognized the distinctive appearance of the Kason 1248 Hinge as a trademark belonging exclusively to Kason. As such, Kason owns U.S. Trademark Registration No. 2,415,070 (the "'070 Mark"), for the appearance of the Kason 1248 Hinge:



(Image from U.S. Trademark Registration No. 2,382,322)

51.    In 1976, Kason began selling a hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1249" (the "Kason 1249 Hinge"). A photograph of the Kason 1249 Hinge, as currently offered by Kason, is shown below:

(From https://www.kasonind.com/index.php/products/hinges/walk-in/1249-spring-assisted-hinge)

52.     The appearance of the Kason 1249 Hinge mimics the appearance of

the Kason 1246 Hinge, while adding a compatible housing for a spring mechanism.

53.     The United States Patent and Trademark Office has recognized the

distinctive appearance of the Kason 1249 Hinge as a trademark belonging

exclusively to Kason. As such, Kason owns U.S. Trademark Registration No.

2,415,066 (the "'066 Mark"), for the appearance of the Kason 1249 Hinge:



(Image from U.S. Trademark Registration No. 2,415,066)

54.    In 1997, Kason began selling a door closer for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1095" (the "Kason 1095 Door Closer"). A photograph of the Kason 1095 Door Closer, as currently offered by Kason, is shown below:





(From https://www.kasonind.com/index.php/
products/door_closers/1095_spring_action_door_closer)

55.    The United States Patent and Trademark Office has recognized the

distinctive appearance of the Kason 1095 Door Closer as a trademark belonging

exclusively to Kason. As such, Kason owns U.S. Trademark Registration No.

4,906,918 (the "'918 Mark"), for the appearance of the Kason 1095 Door Closer:



(Image from U.S. Trademark Registration No. 4,906,918)

56.    Over the years, and in recognition of the distinctive appearance of Kason's parts, the United States Patent and Trademark Office awarded numerous additional trademark registrations to Kason.

57.    Relevant to this action, the trademark registrations awarded to Kason include:

| Trademark Reg. No. | Product | Image |
|---|---|---|
| 2,176,043 | 1245 Hinge |  |
| 2,382,322 | 1246 Hinge |  |
| 2,415,070 | 1248 Hinge |  |
| 2,415,066 | 1249 Hinge |  |

| Trademark Reg. No. | Product | Image |
|---|---|---|
| 4,906,918 | 1095 Door Closer |  |

58.     True and correct copies of the trademark registration certificates for the above marks (collectively, the "Kason Marks") are attached hereto as Exhibit 1.

59.     Pursuant to 15 U.S.C. § 1111, Kason provided notice and all Defendants were aware that the Kason Marks are registered, because Kason includes the "®" in its part catalogs and on its publicly available website. Since at least 2006, Kason's catalogs have included the "®" next to parts protected by registered trademarks. Additional, and more recent, Kason catalogs also include the "®" next to parts protected by registered trademarks. Kason also includes information about the relevant patents on its website at both the product webpage (*see* Paragraphs 44, 46, 48, 50, and 52, above) and at https://www.kasonind.com/index.php/patents where it lists all relevant IP covering each product, on a product-by-product basis.

**V.    Defendants' Business Activities**

   **A. Background**

60.    On information and belief, Nor-Lake and Master-Bilt have been in operation for many years, manufacturing and distributing food service refrigeration equipment and other related items. For many years, they were competitors, and each of them was a customer of Kason, purchasing hardware components for installation on new finished products, and for sale to their customers as replacement parts.

61.    Upon information and belief, in 2020 investment firm Ten Oaks Group acquired Nor-Lake and Master-Bilt, and formed RSG to manage the two businesses. RSG began managing the Nor-Lake and Master-Bilt business with Kason.

62.    Defendants offer replacement parts to the consuming public for use with their products incorporating those parts on at least partstown.com.

63.    Kason and Defendants are both direct and indirect competitors in the commercial restaurant equipment replacement parts industry.

   **B. Defendants' Unlawful Conduct**

64.    In August of 2024, an employee of RSG notified Kason that Defendants had found an alternative to Kason as the source of certain hinges,

27

latches, and walk-in panel fasteners. The part numbers identified at that time, along with their corresponding Kason part numbers, are:

| Defendants' Part No. | Kason Part No. | Type of Part |
|---|---|---|
| NL 029154 (MB 35-01717) | 1188RBP | Panel Lock Strike Assembly |
| NL 029155 (MB 35-01715) | 1188RP | Panel Lock Hook Assembly |
| NL 071601 (MB 35-01893) | 1249 | Hinge |
| NL 125373 (MB 35-01490) | 1095 | Door Closer |
| NL 107916 (MB 35-01761) | 921C | Door Handle w/Lock |
| NL 083478 (MB 083478) | 1246 | Hinge |

65.     Upon information and belief, the prefix "NL" indicates that the part number is used by Nor-Lake, and the prefix "MB" indicates that the part number is used by Master-Bilt.

66.     Kason became suspicious that any such alternative versions of its hardware had been manufactured to be direct copies of its original designs. These designs were protected by registered trade dress, or by issued patents. At the very least, Kason does not provide customers with engineering drawings of its products until after they sign a non-disclosure agreement, which limits the ways that the customer may use the drawings.

67.     Kason investigated the Defendants' ordering history of the products identified as part of Defendants' "dual source" efforts, and of other products.

Kason discovered that the Defendants' orders for various standard Kason hardware items, and for at least one custom-designed hardware item, had been declining. Declining orders indicated the possibility that Defendants had found a substitute supplier for these items. Kason also suspected that the substitute parts that it did not manufacture were exact copies of Kason's designs, including copies of designs protected by registered trade dress or patents.

68. On October 2, 2024, a Kason employee visited the Master-Bilt facility in New Albany, Mississippi. He asked for a tour of the plant and product stock,and was able to verify that counterfeit copies of multiple Kason hardware items were present in that factory.

69. Specifically, that inspection revealed that although these parts had the same appearance as the Kason part, the reverse side lacked the Kason trademark and part number, indicating that they were not genuine Kason hardware items. Master-Bilt personnel at the factory stated that all product in house was shipped down from the Nor-Lake facility in Hudson, Wisconsin.

### i. Defendants' Sale of Counterfeit Products at Partstown.com

70. Defendants offer replacement parts for the Nor-Lake and Master-Bilt finished products, such as walk-in refrigerators and freezers, for sale at partstown.com. For example:



(From https://www.partstown.com/norlake/nor071603#id=manualsDiagrams)

71.     Upon information and belief, Defendants are aware that the product image was made from a genuine Kason product.

72.     The use of images of Kason's products in such product listings allows persons familiar with Kason's product line to find the replacement part they need, even if the Kason part number is not used in the listing. Many OEMs other than the Defendants use this Kason hinge on their finished products. Upon information and belief, a user seeking this hinge for a product made by another OEM could recognize the part from this image and would order it for use on a product not made by Nor-Lake.

73.     Kason ordered two Nor-Lake replacement parts from Parts Town – NOR071603   and NOR083479. Both parts should have been genuine Kason parts, because Kason is the supplier to Defendants for these parts, and Kason holds registered trade dress rights to those products' designs. Instead, the parts that were

delivered from Parts Town appeared identical to Kason parts, but did not have the markings showing they were genuine parts.

74.    Specifically, when the NOR071603 product was delivered, it appeared to be a copy of the Kason 1245 Hinge. The delivered product had the same appearance as the Kason product:

Kason 1245 Front

Counterfeit 1245 Front



75.    The underside of each item is not the same, however. The genuine Kason item has the company name "Kason®," and the part number (1245). The counterfeit item delivered from the Parts Town website lacks those markings, indicating that the item that was delivered is not a genuine Kason product:

## Kason 1245 Back        Counterfeit 1245 Back

 

76. Similarly, when the NOR083479 product was delivered, it appeared to be a copy of the Kason 1248 Hinge. The delivered product has the same appearance as the Kason product:

Kason 1248 Front                    Counterfeit 1248 Front

    

77.    The underside of each item is not the same, however. The genuine Kason item has the company name "Kason®," and the part number (1248). The counterfeit item delivered from the Parts Town website lacks those markings, indicating that the item that was delivered is not a genuine Kason product:

Kason 1248 Back          Counterfeit 1248 Back

 

78.    Upon information and belief, Defendants have caused unauthorized copies of the Kason 1245 and Kason 1248 Hinges to be distributed to consumers, either directly or indirectly, by installing those hinges on Defendants' finished products.

79.    Upon information and belief, Defendants have caused unauthorized copies of other Kason products with unique appearances protected by registered U.S. trademarks to be distributed to consumers, either directly or indirectly, by

34

offering those products for sale as replacements parts purchased directly from

Defendants, or from distributors such as Parts Town.

80.    Upon information and belief, Defendants have caused unauthorized

copies of other Kason products with unique appearances protected by registered

U.S. trademarks to be distributed to consumers, either directly or indirectly, by

installing those unauthorized copies on Defendants' finished products.

**ii.  Defendants' Breach of the Kason NDA and Sale of Related Counterfeit Products**

81.    Defendants also have purchased from Kason the locking door latch

identified by Kason part No. 921C. Defendants identify that item by the Nor-Lake

part number 107916-HANDLE NL9800.   See

https://www.partstown.com/norlake/nor107916  This is also one of the items

identified by Defendants as being part of their dual sourcing program.

82.    In December 2023, an employee of RSG requested the "step file" for

this item. A step file is a computer-aided design ("CAD") drawing of a

manufactured item that can be used for several purposes, including, but not limited

to, duplicating that item. Kason's employee responded that a signed non-disclosure

agreement would be required before Kason would release the step file.

83.    RSG's employee supplied the signed NDA, and Kason provided the

step file. A true and correct copy of the signed NDA is attached hereto as Exhibit

2. The NDA expressly states, among other things, that "Customer shall not at any

35

time divulge to others or use for its own purposes" the drawings that Kason provides.

84.     Upon information and belief, Defendants supplied the step file for the Kason product to Defendants' alternate supplier to support the production of a copy of the part that Kason had been supplying to the Defendants. The proprietary Kason step file can be used in many ways, including setting up the tooling for the factory, as well as making quality control and inspection documents. Using the step file would save Defendants and their new supplier time and money, avoiding the significant cost of creating the drawings, tooling, and other items from scratch.

85.     Upon information and belief, Defendants have imported into the U.S. copies of the genuine Kason 921C handle that were made using Kason's proprietary step file, installed such handles on finished products, offered such finished products for sale, and sold such finished products.

86.     Upon information and belief, Defendants have offered for sale and sold in the U.S. copies of the genuine Kason 921C handle that were made using Kason's proprietary step file into the replacement parts aftermarket via Parts Town or other distributors..

### iii.  Defendants' Misleading Use of Kason Product Images to Sell Their Counterfeit Products

36

87.     Defendants also offer replacement parts for Master-Bilt walk-in
refrigerators and freezers for sale at partstown.com:



https://www.partstown.com/master-bilt/mb35-01490.

88.     The image of the product is of the genuine Kason 1095 Door Closer.
This part – MB 35-01490 –  also is one of the parts that RSG identified as being
sourced from a party other than Kason.

89.    Defendants identified the 1095 Door Closer as one of the items it was dual sourcing. Kason has reason to believe that substitute 1095 Door Closers were manufactured to Defendants' specifications to copy the Kason part.

90.    Upon information and belief, Defendants have caused unauthorized copies of the Kason 1095 Door Closer to be distributed to consumers, either directly or indirectly through distributors such as Parts Town, when consumers were led to believe that they would be receiving the genuine Kason 1095 Door Closer depicted in the product advertisement.

91.    Upon information and belief, in addition to the Kason 1095 Door Closer, Defendants have caused unauthorized copies of other Kason products with unique appearances protected by registered U.S. trademarks, such as the other dual sourced products, to be distributed to consumers, either directly or indirectly through distributors such as Parts Town, when consumers were led to believe that they would be receiving the genuine Kason product depicted in the product advertisement.

92.    As detailed above, Defendants feature Kason hardware in their marketing communications that depict those items as being incorporated into Defendants' finished products. Upon information and belief, Defendants have caused unauthorized copies of Kason products with unique appearances protected by registered U.S. trademarks, such as the other dual sourced products, to be

installed on Defendants' finished products and distributed to consumers. Those consumers did not receive the Kason hardware that Defendants led them to believe they would receive as part of the finished products.

### iv. Defendants' Copying of Patented Products

93.    Upon information and belief, Defendants also have caused unauthorized copies to be made of the Kason 1188RBP Panel Lock. This item has been covered by multiple patents, at least one of which is currently in effect – U.S. Patent No. 9,803,403. Other patents were in effect for at least some of the six years prior to the filing of this complaint.

94.    Because the panel locks are embedded in large walk-in freezers or refrigerators, Kason has not been able to obtain samples to analyze for infringement of the relevant patents. Because the panel lock also was one of the items the Defendants stated they were having dual sourced, Kason has reason to believe that counterfeit panel locks have been manufactured to Defendants' specifications to copy the Kason part, and therefore infringe the Kason patents.

95.    Kason also manufactures a version of the 921C locking door handle that includes a specific interior release assembly. That version is covered by U.S. Patent Nos. D813644 and 11,261,628. Kason delivered some handles of this design to Defendants. Kason has not been able to obtain samples to analyze for infringement of the relevant patents. Because the 921C handle also was one of the

items the Defendants stated they were having dual sourced, Kason has reason to

believe that substitute 921C handles were manufactured to Defendants'

specifications to copy the Kason part, and therefore infringe one or more of these

Kason patents.

## VI. KASON PROVIDES NOTICE OF REGISTRATION OF ITS INTELLECTUAL PROPERTY, AND DEFENDANTS HAD ACTUAL NOTICE THAT KASON'S MARKS WERE REGISTERED

96.    Pursuant to 15 U.S.C. § 1111, Kason has provided notice that its trade

dress marks are registered by displaying the "®" in its product catalogs since about

2006, and has also provided notice on its website on both the pages for each

product, as well as at https://www.kasonind.com/index.php/patents where it lists all

relevant IP covering each product, on a product-by-product basis. Thus Kason has

provided sufficient notice that the appearance of its products are protected by

Trademark Nos. '043, '322, '070, '066, and '918 Marks.

## VII. DEFENDANTS' HARMFUL ACTIONS ADVERSELY AFFECT KASON

97.    Kason and Defendants are direct and indirect competitors in the

commercial restaurant equipment industry, at least for the sales of replacement

restaurant equipment parts.

98.    As a result of the foregoing, Defendants have been offering to sell,

selling, and/or continuing to offer to sell, and/or selling parts not supplied by

40

Kason in ways that infringe some or all of Kason's patent and trademark rights, including the Kason Patent and the Kason Marks.

99.    The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion or mistake, or to deceive consumers, the public, and the trade into believing that copies of Kason parts offered for sale and sold by Defendants are genuine parts of Kason.

100.    Kason and Defendants market to and try to influence the same group of customers to purchase their wares. But Defendants do so by infringing Kason's intellectual property rights. Upon information and belief, the infringing parts are of different, and in many cases, lesser quality and have not undergone the testing to ensure the high standards of durability that Kason requires of parts bearing the famous Kason name and other marks, which symbolize Kason's reputation and goodwill. By infringing Kason's intellectual property rights, Defendants unlawfully and without authorization from Kason seek to gain the benefit of Kason's reputation for strict quality standards that Kason's customers have come to recognize through Kason's trademarks.

101.    Defendants' infringing parts also are deficient and inferior to Kason's parts because, on information and belief, those parts are not NSF (National Sanitation Foundation) certified. *See* NSF Search Results for Nor-Lake, https://info.nsf.org/Certified/Food/Listings.asp?TradeName=&CompanyName=nor

-lake&PlantState=&PlantCountry=&PlantRegion=&Standard=&search=Search

(none of the infringing Nor-Lake parts are listed); NSF Search Results for Master-Bilt,

https://info.nsf.org/Certified/Food/Listings.asp?Company=C0026566&Standard=0 07 (none of the infringing Master-Bilt parts are listed). See Exhibits 3 and 4. This lack of certification causes harm because Kason's parts are NSF certified, and when a customer believes that a part was produced by Kason, they expect the part to be NSF certified. NSF certification requires compliance with strict standards and procedures, undergoing extensive part testing and material analysis to comply with food safety protocols. The Kason parts at issue herein are NSF certified.

102.    Upon information and belief, the NSF regulations require that for a finished commercial refrigerator or freezer to be identified as NSF certified, each hardware component on that product must be certified as NSF compliant.

103.    Upon information and belief, to the extent that Defendants are using uncertified hardware in place of hardware that had been supplied by Kason and is NSF certified, Defendants are falsely representing to the consuming public that its products are NSF certified.

104.    Each sale by Defendants of the infringing parts is a lost sale for Kason, causing a loss in market share, revenue, and the business opportunities reflected by these measures.

105.    Kason's goodwill also is at risk if Defendants do not stop infringing the Kason Marks. By copying Kason's parts and/or offering those parts as competing parts, Defendants are trading off of Kason's reputation and goodwill as a leading innovator in the field of restaurant equipment components symbolized by Kason's Marks. As a result, Defendants gain a competitive advantage in influencing purchasers of restaurant equipment using Kason's Marks and also unfairly gains a potential foothold in the market with customers, which irreparably harms Kason as the single source of origin for the trademarked Kason parts.

106.    Defendants' infringement further harms Kason because Defendants will unfairly gain entry into the market for restaurant equipment parts using the Kason Marks, including selling related replacement parts in the future, as well as the aftermarket for repairs, all as a result of Defendants' infringing activity.

107.    Kason's OEM customers purchase and incorporate Kason's parts into the products they manufacture, including commercial restaurant equipment. After the passage of time, the customers will often need replacement parts and aftermarket repairs. As would be expected, those customers turn to Kason.

108.    Once a customer has made investments of time, energy, and resources into choosing certain hardware and parts from one manufacturer, and has confirmed that the finished part meets all applicable codes and desires, the customer is reluctant to change manufacturers and/or parts and, as a consequence,

it becomes very difficult for another manufacturer to sell competing hardware to the customer. Additionally, once a piece of hardware is installed and in use, the hardware manufacturer gains the intangible benefit of beginning to build a stronger relationship with the end users who become familiar with the hardware through actual day-to-day use.

109.   For these reasons, Kason commonly invests a substantial amount of time, energy, and resources into developing, patenting, certifying, registering, marketing, and selling new parts, with the reasonable expectation that there will be a substantial return on its investments as the new parts emerge in the marketplace, and as replacement parts and repairs are needed. As a result, once Defendants misuse, for example, the appearance of the non-Kason Hinge to convince a customer to order parts from Defendants instead of Kason, the consumer and Kason are immediately and irreparably harmed. The consumer is likely to receive an inferior product, including missing out on Kason's continued efforts to improve its products. Kason's reputation is then harmed when the consumer associates the lower quality product with Kason, because the product is designed to mimic the unique appearance of the Kason product.

110.   The same results also can arise if the manufacturer that made the counterfeit parts for Defendants successfully markets those parts to Kason's other OEM customers. Kason's hardware parts, including those with unique appearances

that are protected by registered U.S. trademark protection, are used by multiple OEMs on their finished products. Those OEMs are prime targets for the sale of counterfeit parts that allow the OEMs to circumvent Kason as the sole legitimate supplier of these hardware products.

111.    Kason invested substantially in developing, patenting, trademarking, creating, achieving and maintaining NSF certification, improving, and marketing its parts. By doing so, Kason created a demand for the parts represented by the Kason Marks among customers and others in this market. Kason reasonably expected the trajectory of its development, marketing, and sales efforts and investments to result in sales to many different customers and at prices commensurate with its market position for these parts, and with gaining positive goodwill and reputation for its parts and features, and with additional business opportunities flowing therefrom because Kason had an early foothold in the emerging market for its branded parts.

112.    As a result of Defendants' actions, Kason has or will suffer price erosion, loss of goodwill, damage to reputation, future damages from lost sales of replacement parts and equipment repair, and loss of other business opportunities. As a result, Kason has been and will continue to be irreparably harmed by Defendants' actions.

## COUNT I
## (Trademark Counterfeiting and Infringement – 15 U.S.C. § 1114)

113.   Kason restates and incorporates the averments set forth in the above paragraphs as if fully set forth herein.

114.   The Kason Marks and the goodwill of the business associated with them in the United States and throughout the world are of great and incalculable value, are highly distinctive, and have become universally associated in the minds of the purchasers of foodservice equipment hardware with Kason's parts and related services of the very highest quality and reputation.

115.   Defendants have manufactured, imported into the United States, distributed, offered for sale, advertised, and/or marketed parts to the consuming public using a counterfeit product and/or in direct competition with Kason's provision of goods under the Kason Marks, in or affecting interstate commerce.

116.   Defendants acted without Kason's authorization or consent, and with knowledge of Kason's well-known and prior rights in the registered Kason Marks. Despite that knowledge, Defendants' parts are intentionally confusingly similar to and/or substantially indistinguishable from, the Kason Marks.

117.   By their sales and use of copies or confusingly similar versions of the Kason Marks in conjunction with selling and advertising Defendants' goods, Defendants are likely to cause, and are causing, confusion, mistake, and deception among the general purchasing public as to the origin of Defendants' goods, and are

46

likely to deceive the public into believing the goods being promoted and sold by Defendants bearing the Kason Marks originate from, are associated with, or are otherwise authorized by Kason, all to the damage and detriment of Kason's reputation, goodwill, and sales.

118.   Defendants' use of the Kason Marks also is likely to cause, and is causing, confusion, mistake, and deception among the restaurant equipment selling community and purchasing public, many of whom are small business owners, as to the origin of related goods using the Kason Marks, and is likely to deceive that public into believing that Defendants' parts are related goods that originate from, are associated with, or are otherwise authorized by Kason, all to the damage and detriment of Kason's reputation, goodwill and sales.

119.   Kason has been and will continue to be harmed by Defendants' wrongful conduct.

120.   In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Defendants' aforesaid acts, Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

121.   As the direct and proximate result of Defendants' deliberate and intentional infringement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained, including future damages from lost sales of replacement parts and equipment repair services.

122.   Kason is entitled to treble damages, attorneys' fees, and/or statutory damages for Defendants' use of counterfeit marks pursuant to 15 U.S.C. §§ 1117(a), (b), and (c).

123.   For Kason to recover such damages, Defendants need not know that the marks being used are federally registered trademarks.

124.   Kason also is entitled to injunctive relief, as detailed in 15 U.S.C. § 1116, including seizure of goods bearing counterfeit marks under § 1116(d).

## COUNT II
## (Unfair Competition and False Designation of Origin – 15 U.S.C. § 1125(a))

125.   Kason restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

126.   The goods bearing the Kason Marks sold and offered for sale by Defendants are of the same nature and type as the goods and services sold and offered for sale by Kason and, as such, Defendants' use is likely to cause confusion to the general purchasing public, and to the restaurant equipment purchasing public. By misappropriating and using the Kason Marks, Defendants misrepresent and falsely describes to the general public and to the purchasing community the

48

origin and source of the goods bearing the Kason Marks and create a likelihood of confusion by consumers and by the purchasers of parts as to the source of such goods and services.

127.   Defendants' actions constitute a false designation of origin, sponsorship, approval, or certification, and a false description or representation of fact, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

128.   Because of Kason's open and widespread use of the Kason Marks in the promotion of Kason's business which competes with Defendants' businesses, and in light of Kason's business relationship with Defendants for sales of genuine parts bearing the Kason Marks, Defendants' use of the Kason Marks is with knowledge and in willful disregard of Kason's rights therein.

129.   Kason has been and will continue to be harmed by Defendants' wrongful conduct.

130.   As the direct and proximate result of Defendants' deliberate and intentional infringement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained.

131.   In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Defendants' aforesaid acts, Defendants have irreparably harmed Kason in ways not readily compensated by

monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

## COUNT III
## (Common Law Trademark Infringement)

132.    Kason restates and incorporates the averments set forth in the above paragraphs as if fully set forth herein.

133.    As a result of Kason's hard work and investments in producing, providing, and promoting its parts associated with the Kason Marks, all of which occurred long before Defendants began marketing and selling the parts that infringe, Kason has built up valuable goodwill in the Kason Marks. As such, the Kason Marks have become associated with Kason's parts and services and have come to symbolize the reputation for quality and excellence of the Kason parts and services.

134.    Defendants' unauthorized use of the Kason Marks is being made with Defendants' knowledge of Kason's well-known and prior rights in the Kason Marks.

135.    Defendants' unauthorized use of the Kason Marks is likely to cause confusion or to deceive the consuming public and the purchasers of restaurant equipment and constitutes trademark infringement under the common law of the State of Wisconsin, and the laws of the United States.

136.    Defendants' acts constitute willful infringement of Kason's exclusive rights in the Kason Marks , in violation of state common law.

137.    Kason has been and will continue to be harmed by Defendants' wrongful conduct.

138.    In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Defendants' aforesaid acts, Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

139.    As the direct and proximate result of Defendants' deliberate and intentional infringement, Kason continues to suffer injury in an amount not yet ascertained.

## <u>COUNT IV</u>
## <u>(Wisconsin Deceptive Trade Practices Act Wis. Stat. § 100.18)</u>

140.    Kason restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

141.    As a result of Kason's hard work and investments in producing, providing, and promoting its parts associated with the Kason Marks , Kason has built up valuable goodwill in the Kason Marks . As such, the Kason Marks have

become associated with Kason's parts and services and have come to symbolize the reputation for quality and excellence of the Kason parts and services.

142.  Defendants, with full knowledge of the Kason Marks and of Kason's prior use of same, intended to and did trade on the goodwill associated with the Kason Marks.

143.  Specifically, Defendants have misleadingly represented that their counterfeit products are Kason's proprietary products by using Kason's registered trade dress and, in at least one case, by using photos of the Kason product to sell its counterfeit products.

144.  Defendants' acts have misled and continue to mislead and deceive the public as to the source of the goods and services offered by Defendants, permit and accomplish passing off of the goods offered by Defendants as those of Kason, and falsely suggest a connection with Kason.

145.  Therefore, Defendants have committed unfair competition and engaged in deceptive trade practices in violation of Wisconsin law Wis. Stat. § 100.18.

146.  Kason has been and will continue to be harmed by Defendants' wrongful conduct.

147.  In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment,

and the customer relationships undermined by Defendants' aforesaid acts, Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

148.    As the direct and proximate result of Defendants' deliberate and intentional infringement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained.

### COUNT V
### (Common Law Breach of Contract)

149.    Kason restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

150.    On November 27, 2023, Defendant RSG entered into a "Customer Non-Disclosure Agreement CAD Models and Drawings" ("the Agreement') wherein RSG agreed that it "shall not at any time divulge to others or use for its own purposes any of the confidential proprietary, or trade secret information loaned by Kason Industries unless authorized to do so in writing by Kason Industries."

151.    Pursuant to this Agreement, Kason furnished RSG with a CAD drawing.

152.   Kason did not provide any authorization to divulge the confidential information provided to RSG.

153.   Upon information and belief, Defendants provided the CAD drawing to one or more third parties, in violation of the terms of the Agreement.

154.   Defendant RSG's breach of the Agreement has harmed Kason by providing competitors of Kason with its proprietary design information, allowing Kason's competitors (as well as Defendants) to sell knock-offs of Kason's proprietary designs.

155.   Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

156.   As the direct and proximate result of Defendants' deliberate and intentional breach of the Agreement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained.

## JURY DEMAND

157.   Plaintiff demands a trial by jury on all disputed issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a judgment in its favor and demands the following relief:

54

1.      A preliminary injunction and a permanent injunction enjoining Defendants, their successors or assigns, and their officers, directors, partners, agents, subcontractors, servants, employees, attorneys, affiliates, licensees, divisions, subsidiaries and related entities, and all others acting in concert or participation with Defendants, from doing any of the following:

        a.  Displaying, marketing, importing, making, offering for sale or selling any unauthorized copy of any item embodying the Kason Marks, or any such similar mark,

        b.  Displaying, marketing, any unauthorized copy of any item embodying the Kason Marks, or any such similar mark, to advertise, promote the sale of, or to identify any part or service offered by Defendants;

        c.  Making, in any manner whatsoever, any statement or representation, or performing any act likely to deceive members of the public about the origin of genuine or non-genuine Kason parts marketed and sold by Defendants;

2.      A decree ordering an accounting by Defendants to establish all profits realized as a result of the wrongful acts by Defendants set forth in this Complaint, and any other wrongful acts by Defendants to be set forth at trial;

3.    Judgment finding that Defendants have willfully infringed Kason's protectable trademarks;

4.    Judgment against Defendants specifically including, but not limited to the following, to the extent allowed by law (including, but not limited to, 35 U.S.C. §§ 281-285, 15 U.S.C. §§ 1114, 1116(d), 1117, and 1125; trademark common law; and Wis. Stat. § 100.18):

      a.  actual monetary damages sustained by Plaintiff, or, in the alternative, statutory damages where such are authorized, including but not limited to $2,000,000 per counterfeit mark per type of good sold, offered for sale, or distributed for the willful counterfeiting by Defendants;

      b.  seizure of all counterfeit products embodying the Kason Marks, including the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation;

      c.  profits unlawfully earned by Defendants as a result of the unlawful acts;

      d.  exemplary, punitive, and treble damages where such are authorized by law;

      e.  costs and prejudgment interest;

f.  attorneys' fees; and

g.  Such other and further relief as the Court deems appropriate and

just under the circumstances.

Dated: October 30, 2024            Respectfully submitted,

 */s/ Matthew J. Duchemin*
Matthew. J. Duchemin
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI  53703
Telephone: (608) 251-5000
Facsimile: (608) 251-9166
matthew.duchemin@quarles.com

Ann G. Fort
GA Bar No. 269995
Anna C. Halsey
GA Bar No. 208034
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
annfort@eversheds-sutherland.com
annahalsey@eversheds-sutherland.com

*Attorneys for Kason Industries, Inc.*

## **VERIFICATION**

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the

statements of fact in the foregoing Verified Complaint are true and correct.

This 30th day of October, 2024.

*/s/ Brian Holdrich*
Brian Holdrich
Vice President of Sales and Marketing
Kason Industries, Inc.