# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| KASON INDUSTRIES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:24-cv-00766-amb |
| | ) | |
| REFRIGERATED SOLUTIONS | ) | **DEMAND FOR JURY TRIAL** |
| GROUP LLC; MASTER-BILT | ) | |
| PRODUCTS, LLC; NOR-LAKE, | ) | |
| INCORPORATED | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Kason Industries, Inc. ("Kason" or "Plaintiff"), by and through its undersigned counsel, filed its Verified Complaint for trademark counterfeiting and infringement, unfair competition and false designation of origin, common law trademark infringement, deceptive trade practices, breach of contract, and related causes of action, against Refrigerated Solutions Group LLC ("RSG"), Nor-Lake, Incorporated ("Nor-Lake"), and Master-Bilt Products, LLC ("Master-Bilt") (collectively "Defendants") on October 30, 2024. In view of additional information Kason has learned, it hereby amends its complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A), and alleges as follows:

## I.    RELEVANT BACKGROUND

1. Since the 1920s, Kason has been and continues to be engaged in the business of developing refrigeration and restaurant equipment hardware in the United States.

2. Today, Kason is headquartered in Newnan, Georgia, where its facilities include over 300,000 square feet of manufacturing plants and offices. Over the years, Kason has created hundreds of innovative, reliable parts and has grown in size, sophistication, and reputation to become a leading manufacturer of commercial refrigeration and restaurant equipment hardware in the United States.

3. The commercial refrigeration and restaurant equipment hardware industry into which Kason sells its parts includes at least two types of customers:

original equipment manufacturers ("OEMs") and replacement hardware distribution customers.

4. OEMs purchase and incorporate certain hardware, such as door latches or door hinges, into the final products that they manufacture, such as commercial walk-in refrigerators and other restaurant equipment purchased by end-user customers. Defendants have been Kason's customers for many years, purchasing Kason parts for use in their commercial refrigeration equipment manufacturing business.

5. High quality door hardware is used in many industries beyond the restaurant and food service context. Trucking companies, power generation facilities, and laboratories also need durable door hardware. Kason serves these and other businesses outside the food service industry.

6. Replacement hardware distribution businesses sell hardware components, such as individual door latches and door hinges, directly to equipment owners such as restaurants and other businesses using that hardware, or to repair companies, who need to replace hardware on the finished products customers have in use.

7. Defendants provide hardware components to replacement hardware distributors. Those hardware components can be used on the final products that Defendants manufactured. Upon information and belief, replacement hardware

distributors also provide hardware components to other OEMs to install on finished products made by those OEMs.

8.    Door components play a critical role in the integrity of commercial refrigeration equipment, including walk-in refrigerators and freezers. Defendant Nor-Lake makes this point in its own promotional materials:

> The door is arguably the most vital yet abused part of a walk-in. Doors must close completely to keep your walk-in airtight, increase energy efficiency, and form an airtight seal against warmer outside air.
>
> The three main components on the door support the seal: hinges, door closers and gaskets.

Norlake Walk-In Advantages, https://norlake.com/nor-lake-products/foodservice/products/norlake-walk-in-advantages/ (last visited Oct. 23, 2024).

9.    The critical door components – no matter how well-made – need to be replaced periodically. Defendant Nor-Lake explains:

> Daily usage in busy foodservice workspaces can be rough on your walk in cooler. Walk ins are frequently subjected to abuse that leads to a variety of issues[. For example,] frequent door slamming results in damaged hinges, closers and handles.

Norlake Walk-In Repair & Refurbishment Brochure (171544), pdf 503185, https://norlake.com/wp-content/uploads/2021/08/171544-Walk-In-Repair-Refurbishment-Brochure.pdf; *see also* Master-Bilt Walk-in Repair &

Refurbishment Brochure, https://master-bilt.com/wp-content/uploads/2021/08/Walk-In-Repair-Refurbishment-Brochure.pdf.

10.    Nor-Lake lists the door closers and hinges as critical elements of its "Dependable Construction," explaining that "spring-activated door closer and magnetic gasket [contribute to] a dependable seal," and that its "durable hinges" have features that "help ensure doors close completely." Nor-Lake Walk Ins Brochure (132819), pdf 1016164, https://norlake.com/wp-content/uploads/2020/07/132819-Walk-Ins-Brochure.pdf.

11.    Nor-Lake promotes Kason's products in its marketing communications that discuss the importance of these features.  For example, Nor-Lake's main brochure pictures a completed door for a walk-in refrigerator or freezer. All three of the hardware items in the picture – door closer at the top, hinges on the sides, and door handle – are the Kason items that Kason has supplied to Defendants for years. The appearance of the door closer and the hinges are protected by registered trademarks.

12.    The same brochure specifically highlights four features as part of "The Doorway to Reliability" marketing message. Two of the four – "Deadbolt Locking Handle" and "Durable Hinges" feature hardware made by Kason. The appearance of the hinge is protected by a registered trademark.

# THE DOORWAY TO RELIABILITY

## Dependable Construction

- Standard doors are infitting and flush-mounted
- Available in 26", 30" and 36" widths
- Cam-lift hinges are spring-loaded for an easy, reliable closure
- Unique field-adjustable hinge backing plates ensure a proper fit of the door to its opening during installation and also allow for any necessary future adjustments
- Spring-activated door closer and magnetic gasket for a dependable seal
- Adjustable double sweep gasket on bottom of door to remove frost build-up on threshold



**Doors can be customized with kickplates and other options to fit your application.**



**Deadbolt Locking Handle**
- Can be independently locked with a key and/or padlock
- Locking mechanism with inside release knob allows for easy exit from walk-in should someone be locked inside
- Entire locking mechanism is on frame portion of door section and will not freeze



**LED Lighting**
- Uses less energy and lasts up to 50,000 hours vs. 1000 hours for incandescent bulbs
- Mounted at the interior top of the door to provide full illumination
- Minimal heat output reduces cooling costs



**Digital Thermometer/ Light Switch**
- Conveniently integrated into one component
- Waterproof "elbow-engaged" illuminated light switch allows user to turn on the light easily, even when hands are full
- Digital display is easy to read in all ambient conditions



**Durable Hinges**
- Field adjustable to compensate for door settling during install or after
- Cam-lift, spring loaded hinges help ensure doors close completely
- Available for either a left- or right-hand opening door

https://norlake.com/wp-content/uploads/2020/07/132819-Walk-Ins-Brochure.pdf at 5 (last accessed on October 28, 2024). See also https://master-bilt.com/wp-content/uploads/2021/09/Walk-Ins-Brochure.pdf at 5 (last accessed on October 29, 2024).

13.    As detailed below, the 921C deadbolt handle, the 1095 door closer, and the 1245 and/or 1248 hinges featured in the Nor-Lake marketing materials are four of the items that Defendants have replaced with look-alike copies, despite Kason's intellectual property and contractual interests in those items. The end users and the customers that manage the equipment have the greatest interaction with the door of a walk-in refrigerator or freezer. Through those interactions, they form important impressions regarding the quality and reliability of the Kason parts that have long been installed on the Defendants' finished products.

14.    Supplying its hardware to replace parts on finished foodservice equipment, such as ice machines, walk-in refrigerators and freezers, and hot side heat-and-hold cabinets and dough proofers, is a major source of revenue for Kason and for other market participants. The commercial context for these products exposes them to extreme wear and tear, as noted by Nor-Lake's marketing material quoted above.  Even high quality mounting parts like hinges and latches eventually wear out.

15. Kason is able to sell its hardware to OEMs like Defendants at a reduced margin for multiple reasons. For example, handling box or skid quantities of identical items requires less labor and uses less packing material. Kason sells replacement parts at higher prices that yield higher margins, because stocking and delivering those parts, including parts on an individual or low-quantity basis, incurs higher costs in the form of more attention from Kason's staff, more packing material, and similar increases in costs compared to the high-volume OEM parts supplying operations.

16. Institutional customers, such as restaurant chains, will sometimes source replacement parts in bulk from Kason, or from the OEM that installs Kason parts on its finished products. Others will buy from Kason indirectly by placing orders through Kason's distributors, including the three regional locations in addition to its Georgia headquarters that Kason owns and manages, which also increase costs due to extra handling and freight expenses. A third channel for replacement parts – independent distributors such as Parts Town – also supply Kason replacement parts to institutional customers.

17. Hinges, handles, and other high-use parts can need replacement multiple times over the life span of the types of refrigerators and freezers that Defendants manufacture. When genuine Kason parts are used to replace the original equipment Kason parts, Kason earns profit from each sale of a genuine

Kason replacement part. One sale to the OEM, like Defendants, can be expected to generate a replacement parts income stream over the course of many years to come.

18.     Interrupting this supply chain, either by substituting counterfeit, look-alike non-Kason parts for genuine Kason parts on the finished OEM product, or by selling non-Kason parts to replace hardware that was originally supplied by Kason without disclosing the true manufacturer of the hardware to the purchaser, diverts Kason's expected profits.

19.     OEMs and independent distributors can also earn a larger profit margin if they can buy the non-Kason part at a lower price. These profits can tempt competitors and distributors to cut corners to reduce the cost of each part, and sometimes to compete unfairly and unlawfully.

20.     Defendants and other participants in this market recognize the value of the Kason brand, and the high quality of Kason's parts. In general, Kason offers a one-year warranty on its parts, which is one of the longest warranties in the food service hardware industry. Kason obtains all relevant sanitary and safety certifications for its parts, including NSF and UL certifications, required for use in the foodservice industry. Additional certifications for the finished product, such as the Miami-Dade County hurricane certification, rely on the quality of the genuine Kason parts to achieve the required performance levels. Kason also enforces

quality control processes to ensure its parts meet Kason's high standards prior to customer delivery.

21.    Kason has intellectual property rights in its brand name (KASON®) and logos, in certain part designs, in certain product names, and in the part numbers that Kason has used consistently for decades. Kason has used the intellectual property protection tools provided by federal and state laws to maintain its unique market identity.

22.    Kason also invests in maintaining a unique visual identity for its products. Many of Kason's products have distinctive appearances that are recognized by consumers in the food services equipment industry and in other industries requiring such hardware, and by the United States Patent and Trademark Office. Kason currently holds registered trademarks in the appearance of many of its distinctive products.

23.    Citing Kason's high quality standards, customers also ask Kason to design and manufacture custom hardware items, to that customer's specifications.

24.    Throughout its history, Kason has obtained at least 100 U.S. and overseas utility patents to protect its technical innovations. Currently Kason owns dozens of utility patents that are in effect, which Kason practices in a wide range of its products.

25.     Kason also has obtained dozens of U.S. and overseas trademark registrations protecting its brands and product designs. In the U.S. alone, over 50 principal registry registrations are currently in effect, of those, 38 cover the protection of non-functional, distinctive trade dress.

26.     Kason has taken steps to control the use of its trademarks and other intellectual property rights over the years, because Kason has the right to control how its parts and the company as a whole are perceived by the purchasers in this market.

27.     Those enforcement steps include requesting others to stop certain unfair or unlawful marketing practices, requiring its authorized distributors to respect Kason's intellectual property while they market Kason's parts, and intervening when third parties seek to improperly copy its trademarks, trade dress marks, and patented technology. At times, and when necessary, Kason has filed lawsuits to protect its rights.

28.     Kason's litigation history shows that it has been the plaintiff in at least fourteen suits alleging patent or trademark infringement, in which Kason has sought to protect and enforce its registered intellectual property rights.

29.     As more fully detailed below, following Defendants' notice to Kason that they had decided to find "secondary sourcing" for certain parts they had purchased from Kason for years, Kason has identified several unfair and deceptive

marketing practices by the Defendants that are harming Kason. These acts are attributed to all Defendants because, while it is unclear which Defendant is directing each of these actions, it is apparent that all Defendants have some role in these actions, from associating their brand names with counterfeit parts (Nor-Lake and Master-Bilt) to communicating with Kason about parts purchasing (RSG).

30.     Upon information and belief, the unfair and deceptive practices used by Defendants include at least the following:

    a.  Selling unauthorized, counterfeit copies of at least five of Kason's parts that are protected by registered trademarks;

    b.  Selling products that incorporate unauthorized, counterfeit copies of at least five of Kason's parts that are protected by registered trademarks;

    c.  Using, or allowing others to use, images of genuine Kason products, including the clearly legible KASON® mark stamped into the product, in "bait and switch" sales tactics that result in the delivery of a counterfeit copy of the pictured, genuine Kason product; and

    d.  Using Kason's trade secret drawings of one of Kason's door lock products "against the best interests of Kason," in breach of an

explicit provision of the non-disclosure agreement Defendant RSG signed in order to receive the drawing.

31. Defendants' acts are not isolated mistakes. They are evidence of an intentional business plan that aims to leverage Kason's goodwill in the marketplace not to sell Kason's parts, but to manufacture, use, and sell unauthorized copies of Kason's parts that are covered by intellectual property protections.

32. Defendants developed this business plan while they enjoyed the benefits of being a long-time Kason customer. Defendants paid reduced prices, enjoyed generous credit terms, received priority turn-around for their orders (often causing Kason to incur overtime expense that Kason absorbed), obtained engineering support at no charge, and, pursuant to a Customer Non-Disclosure Agreement, received copies of CAD models and drawings of Kason's parts to use in incorporating Kason products into Defendants' products. It has become clear that Defendants took everything they know about Kason's parts and used that knowledge to deceive their mutual customer base, and to compete against Kason unfairly, deceptively, and unlawfully.

33. The unfair and deceptive marketing practices that Kason seeks to end are detailed below. Accordingly, in addition to all available monetary damages and compensation, Kason seeks an injunction (1) requiring Defendants, at the very least, to remove counterfeit goods from the stream of commerce, including, but not

limited to, preventing any further sales of counterfeited good by either Defendants, its affiliates, Parts Town, or other third party sellers; and (2) prohibiting the adoption of such tactics and practices in the future.

34.     To the extent that paper catalogs, brochures, and other marketing materials also incorporate these unfair and deceptive marketing tactics, Defendants should be enjoined from (1) further distribution of those materials; and (2) using these unfair and deceptive marketing tactics in any future paper catalogs, brochures, or other marketing materials.

## II.     PARTIES

35.     Kason is a Georgia corporation, with its principal place of business at 57 Amlajack Boulevard, Newnan, Georgia 30265.

36.     On information and belief, Defendant Refrigerated Solutions Group LLC is a Delaware limited liability company. RSG is registered with the Mississippi Secretary of State as a fictitious name for Master-Bilt Products, LLC, with a principal place of business at 727 Second Street, Hudson, WI 54016, and also uses 891 Country Road U, Hudson, WI 54016 as the street address for RSG. Per its filing with the Delaware Secretary of State, RSG has been served through its registered agent, Cogency Global Inc., 850 New Burton Rd. Ste 201, Dover, DE 19904.

37.     On information and belief, Defendant Nor-Lake, Incorporated is a Wisconsin corporation. According to Nor-Lake's March 11, 2024 filing with the Georgia Secretary of State and its corporate records filed at the State of Wisconsin Department of Financial Institutions, its principal place of business is 727 Second Street, Hudson, WI 54016-1515, and Nor-Lake also uses 891 Country Road U, Hudson, WI 54016 as its street address. Per its State of Wisconsin filing, Nor-Lake has been served through its registered agent, Cogency Global, Inc., 100 Wilburn Rd. Ste 100, Sun Prairie, WI 53590.

38.     On information and belief, Defendant Master-Bilt Products, LLC is a Delaware limited liability company. In its filing with the California Secretary of State, Master-Bilt discloses that its principal place of business is 891 County Road U, Hudson, WI 54016. Per its filing with the Delaware Secretary of State, Master-Bilt has been served through its registered agent, Cogency Global Inc., 850 New Burton Rd. Ste. 201, Dover, DE 19904.

39.     On information and belief, RSG owns and/or controls, directly or indirectly, Nor-Lake and Master-Bilt.

### III.   <u>JURISDICTION AND VENUE</u>

40.     This is an action for, inter alia, trademark counterfeiting and infringement, false designation of origin, unfair competition, common law trademark infringement, breach of contract, and related claims pursuant to 15

U.S.C. §§ 1 *et seq.*, including §§ 1114, 1125(a), and for related claims of deceptive

trade practices under the laws of the State of Wisconsin.

41.     This Court has subject matter jurisdiction over this action pursuant to

15 U.S.C. § 1121, and pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a) and (b).

This Court has supplemental jurisdiction over Plaintiff's additional claims,

pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's

federal trademark infringement and counterfeiting claims, over which this Court

has original jurisdiction, that the additional claims form part of the same case or

controversy under Article III of the United States Constitution.

42.     This Court has personal jurisdiction over all Defendants because they

have places of business within this District. They conduct business with Kason

from those places of business, and upon information and belief, counterfeit

merchandise is currently in the possession, custody or control of some or all of the

Defendants at locations within the District.

43.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c),

because a substantial part of the events and injury giving rise to Kason's claims has

occurred and continues to occur in this district.

## IV. KASON'S INTELLECTUAL PROPERTY RELEVANT TO THIS ACTION

### A. Kason's Registered Intellectual Property

44.    In 1972, Kason began selling a distinctive hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1245" (the "Kason 1245 Hinge"). The distinctive styling of this hinge later expanded to "sister" hinges (hinges 1246, 1248, and 1249) that incorporate the curved edges and rounded styling of the 1245 hinge.

45.    A photograph of the Kason 1245 Hinge, as currently offered by Kason, is shown below:




(From https://www.kasonind.com/index.php/products/hinges/walk-in/1245-reversible-cam-rise-hinges)

46.     The United States Patent and Trademark Office has recognized the distinctive appearance of the Kason 1245 Hinge as a trademark belonging exclusively to Kason. As such, Kason owns U.S. Trademark Registration No. 2,176,043 (the "'043 Mark"), for the appearance of the Kason 1245 Hinge:



(Image from U.S. Trademark Registration No. 2,176,043)

47.     In 1974, Kason began selling a hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1246" (the "Kason 1246 Hinge"). A photograph of the Kason 1246 Hinge, as currently offered by Kason, is shown below:





**1246 REVERSIBLE CAM-RISE HINGE**

- Industry standard self-closing cam-rise hinges.
- Door opens with minimum effort.
- Strong self-lubricating nylon cam delivers smooth, trouble-free door operation
- Cam-rise action reduces gasket wear, even with irregular floors
- Holds door open beyond approximately 130°
- Doors lift off without disassembly or removing hinges
- Simple manual operation reverses hinges for use on right- or left-opening door

U.S. Trademark: 2,382,322

**RESOURCES**

Catalog

Hinge Selector

(From https://www.kasonind.com/index.php/products/hinges/walk-in/1246_reversible_cam_rise_hinge)

48.     The United States Patent and Trademark Office has recognized the distinctive appearance of the Kason 1246 Hinge as a trademark belonging exclusively to Kason. As such, Kason owns U.S. Trademark Registration No. 2,382,322 (the "'322 Mark"), for the appearance of the Kason 1246 Hinge:



(Image from U.S. Trademark Registration No. 2,382,322)

49. In 1974, Kason began selling a hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1248" (the "Kason 1248 Hinge"). A photograph of the Kason 1248 Hinge, as currently offered by Kason, is shown below:



(From https://www.kasonind.com/index.php/products/hinges/walk-in/1248-spring-assisted-hinge)

50.    The appearance of the Kason 1248 Hinge mimics the appearance of the Kason 1245 Hinge, while adding a compatible housing for a spring mechanism.

51.    The United States Patent and Trademark Office has recognized the distinctive appearance of the Kason 1248 Hinge as a trademark belonging exclusively to Kason. As such, Kason owns U.S. Trademark Registration No. 2,415,070 (the "'070 Mark"), for the appearance of the Kason 1248 Hinge:



(Image from U.S. Trademark Registration No. 2,415,070)

52.    In 1976, Kason began selling a hinge for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1249" (the "Kason 1249 Hinge"). A photograph of the Kason 1249 Hinge, as currently offered by Kason, is shown below:



**1249 SPRING ASSISTED HINGE**

- Spring mechanism adds extra closing force to overcome air resistance on heavy walk-in doors
- Special high-lift cam system outperforms similar spring hinges
- Cam-rise action reduces gasket wear, even with irregular floors
- Built-in dwell holds door open beyond 130°
- Simple manual operation reverses hinges for use on right or left-opening door

U.S. Trademark: 2,415,066



**RESOURCES**

Catalog

Hinge Selector

NSF COMPONENT

(From https://www.kasonind.com/index.php/products/hinges/walk-in/1249-spring-assisted-hinge)

53.     The appearance of the Kason 1249 Hinge mimics the appearance of the Kason 1246 Hinge, while adding a compatible housing for a spring mechanism.

54.     The United States Patent and Trademark Office has recognized the distinctive appearance of the Kason 1249 Hinge as a trademark belonging exclusively to Kason. As such, Kason owns U.S. Trademark Registration No. 2,415,066 (the "'066 Mark"), for the appearance of the Kason 1249 Hinge:



(Image from U.S. Trademark Registration No. 2,415,066)

55.     In 1997, Kason began selling a door closer for use in walk-in refrigerators and freezers, which is designated with the Kason part number "1095" (the "Kason 1095 Door Closer"). A photograph of the Kason 1095 Door Closer, as currently offered by Kason, is shown below:





(From https://www.kasonind.com/index.php/
products/door_closers/1095_spring_action_door_closer)

56.     The United States Patent and Trademark Office has recognized the

distinctive appearance of the Kason 1095 Door Closer as a trademark belonging

exclusively to Kason. As such, Kason owns U.S. Trademark Registration No.

4,906,918 (the "'918 Mark"), for the appearance of the Kason 1095 Door Closer:



(Image from U.S. Trademark Registration No. 4,906,918)

57.     Over the years, and in recognition of the distinctive appearance of Kason's parts, the United States Patent and Trademark Office awarded numerous additional trademark registrations to Kason. Relevant to this action, the trademark registrations awarded to Kason include:

| Trademark Reg. No. | Product | Image |
|---|---|---|
| 2,176,043 | 1245 Hinge | |

| Trademark Reg. No. | Product | Image |
|---|---|---|
| 2,382,322 | 1246 Hinge |  |
| 2,415,070 | 1248 Hinge |  |
| 2,415,066 | 1249 Hinge |  |
| 4,906,918 | 1095 Door Closer |  |

58.     True and correct copies of the trademark registration certificates for

the above marks (collectively, the "Kason Marks") are attached hereto as

Exhibit 1.

## B. **Kason's Registered Trade Dress Is Valid and Incontestable**

59.     A trademark that is registered on the principal register is presumed

valid, pursuant to 15 U.S.C. § 1115(a). Each of Kason's registered trademarks are

registered on the principal register, and are therefore presumptively valid. *See*

Exhibit 1, trademark registration certificates for the Kason Marks.

60.     In addition, where a trademark has become incontestable under 15

U.S.C. § 1065, the registration "shall be conclusive evidence of the validity of the

registered mark and the registration of the mark, of the registrant's ownership of

the mark, and of the registrant's exclusive right to use the mark in commerce." 15

U.S.C. § 1115(b).

61.     Each of the Kason Marks at issue herein has achieved incontestable

status under 15 U.S.C. § 1065, as each of the Kason Marks has been in continuous

use since their dates of registration and are still in use in commerce today.

Appropriate filings have been made to claim this status for each of the Kason

Marks and the USPTO has entered its Notice of Acceptance and Notice of

Acknowledgement in response.

## C. **Kason Provides Notice of Its Registered Trade Dress**

62. Pursuant to 15 U.S.C. § 1111, Kason provided notice and all Defendants were aware that the Kason Marks are registered, because Kason includes the "®" in its part catalogs and on its publicly available website. Since at least 2006, Kason's catalogs have included the "®" next to parts protected by registered trademarks. Additional, and more recent, Kason catalogs also include the "®" next to parts protected by registered trademarks. Kason also includes information about the relevant trademarks on its website at both the product webpage (*see* Paragraphs 45, 47, 49, 52, and 55, above) and at https://www.kasonind.com/index.php/patents where it lists all relevant IP covering each product, including trademark registrations, on a product-by-product basis.

63. In addition, Kason provided Defendants personal notice of its registered intellectual property on at least January 31, 2024, when it provided RSG employee Lynn Burge with an updated Kason branding guidelines document sent to her email address lburge@refsg.com, in August 2024, when it notified RSG that the products it was "dual sourcing" were covered by registered intellectual property, and on October 31, 2024, when counsel for Kason delivered a copy of the original Verified Complaint in this case to RSG's CEO, Aaron Brown, to his email address abrown@refsg.com.

## D. **Kason's Registered Trade Dress Is Valid and Enforceable**

64.     To prevail on a claim of trade dress infringement, plaintiff must show that (1) its trade dress is protectible because it is either inherently distinctive or has acquired secondary meaning and (2) the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products.

65.     Each of the five Kason trade dress registrations has achieved incontestability under 15 U.S.C. §1065. Under 15 U.S.C. §1115(b). Each such registration is conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.

66.     In a claim for trade dress infringement, the fact that the Trademark Office has issued a federal trademark registration for the trade dress mark creates a presumption that the mark is valid and that plaintiff has established secondary meaning. When the registration has become incontestable, those presumptions become conclusive evidence of both the marks' validity, and of the establishment of secondary meaning.

67.     Even if secondary meaning were not established conclusively by the registrations' incontestable status, the trade dress marks at issue all have established secondary meaning based on at least the following facts:

a. the fact that Kason has been the exclusive supplier of these designs over a period of decades;

b. Kason's extensive advertising and promotion of each of these marks at trade shows, in product catalogues, and in other forms of advertising;

c. Kason's annual sales of each item going back for the last ten years alone, which total tens of millions of dollars; and

d. Defendants' intentional copying of these designs.

68.     The registrations also give rise to the presumption that the trade dress designs are not functional. Defendants are not able to overcome this presumption.

69.     The registered trade dress of the strap hinges is characterized by these main features: (1) cylindrical hinge casing; (2) straps that are wider as they approach the flange, narrowing to the center of the door; (3) a raised strip down the length of the strap part of the hinge; and (4) rounded, streamlined edges on both the overall shape, and on the interior raised edges.

70.     These features of the strap hinges are decorative, not functional. None of them makes the part stronger, or longer lasting, for example.

71.     This point is supported by the fact that Kason's competitors offer for sale strap hinges to be used for the same applications on the doors of walk-in refrigerators. While they do use the general structure of a strap hinge, they do not

have the same appearance as Kason's registered trade dress designs. One such example is characterized by sharp, not rounded, edges and a rectangular, not cylindrical, hinge casing:



https://www.componenthardware.com/en/hinge-cam-rise-lift-off-zn-polished-chromefl-offset-575l-x-2w-x-55h-short-strap-nsf

72.    Furthermore, before they were registered on the U.S. Principal Register, evidence of other products to be used for the same applications with dissimilar appearance was provided by Kason for each of the Kason hinge marks.

73.    For the 1095 door closer, the unique feature of the trade dress is (1) a trapezoidal shape that is narrower width at the bottom than on the top, and (2) the sloped top edge.

74.    The design features are decorative, not functional. The trapezoidal shape does make the part stronger, or longer lasting, for example.

75. This point is supported by the fact that Kason's competitors offer for sale door closers used for the same applications on the doors of walk-in refrigerators. While they have the same basic parts, they do not have the same appearance as Kason's registered trade dress designs. For example, the W95-1020 door closer supplied by Kason's competitor, Component Hardware Group, has a large, noticeable step structure that Kason's design lacks:



https://www.etundra.com/restaurant-parts/refrigeration-parts/door-closers/chg-w95-1020-heavy-duty-offset-spring-action-door-closer/

Furthermore, before it was registered on the U.S. Principal Register, evidence of other products to be used for the same application with dissimilar appearance was provided by Kason for this door closer marks.

## V.     DEFENDANTS' BUSINESS ACTIVITIES

### A. Background

76. On information and belief, Nor-Lake and Master-Bilt have been in operation for many years, manufacturing and distributing food service refrigeration

equipment and other related items. For many years, they were competitors, and each of them was a customer of Kason, purchasing hardware components for installation on new finished products, and for sale to their customers as replacement parts.

77.     Upon information and belief, in 2020 investment firm Ten Oaks Group acquired Nor-Lake and Master-Bilt, and formed RSG to manage the two businesses. RSG began managing the Nor-Lake and Master-Bilt business with Kason.

78.     Through at least one independent online distributor, partstown.com, Defendants offer replacement parts to the consuming public for use with Defendants' products incorporating those parts.

79.     Kason and Defendants are both direct and indirect competitors in the commercial restaurant equipment replacement parts industry.

**B. Defendants' Unlawful Conduct**

80.     Only on July 29, 2024, did RSG notify Kason that it was "starting buying from a new vendor due to cost," but did not specifically identify what it was buying from the new vendor. A true and correct copy of said communication is attached hereto as Exhibit 2.

81.     In August of 2024, an employee of RSG notified Kason that Defendants had found an alternative to Kason as the source of certain hinges,

latches, and walk-in panel fasteners. The part numbers identified at that time, along with their corresponding Kason part numbers, are:

| Defendants' Part No. | Kason Part No. | Type of Part |
|---|---|---|
| NL 029154 (MB 35-01717) | 1188RBP | Panel Lock Strike Assembly |
| NL 029155 (MB 35-01715) | 1188RP | Panel Lock Hook Assembly |
| NL 071601 (MB 35-01893) | 1249 | Hinge |
| NL 125373 (MB 35-01490) | 1095 | Door Closer |
| NL 107916 (MB 35-01761) | 921C | Door Handle w/Lock |
| NL 083478 (MB 083478) | 1246 | Hinge |

Upon information and belief, the prefix "NL" indicates that the part number is used by Nor-Lake, and the prefix "MB" indicates that the part number is used by Master-Bilt.

82. Kason investigated the Defendants' ordering history of the products identified as part of Defendants' "dual source" efforts, and of other products. Kason confirmed that the Defendants' orders for various standard Kason hardware items, and for at least one custom-designed hardware item, had been declining prior to the August 2024 communication. The declining orders indicated the possibility that Defendants had found a substitute supplier for these items far

earlier than August 2024. Kason also suspected that the substitute parts from the "new vendor" were exact copies of Kason's designs, including copies of designs protected by registered trade dress or patents.

83.     Kason responded to RSG by notifying RSG that Kason holds substantial intellectual property rights, including registered trade dress, over its parts, including those included on the list provided by RSG. A true and correct copy of that communication is attached as <u>Exhibit 3</u>.

84.     Upon information and belief, under all of the circumstances, Defendants would have required multiple years to find the source, design the replacement parts, and plan for manufacturing and importation of those parts. Thus, Defendants must have begun the process of seeking new sources of exact copies of the Kason products covered by the Kason Marks long before they admitted to using an alternative supplier in 2024.

85.     On October 2, 2024, a Kason employee visited the Master-Bilt facility in New Albany, Mississippi. He asked for a tour of the plant and product stock, and was able to verify that counterfeit copies of multiple Kason hardware items were present in that factory.

86.     Specifically, that inspection revealed that although these parts had the same appearance as the Kason part, the reverse side lacked the Kason trademark and part number, indicating that they were not genuine Kason hardware items.

Master-Bilt personnel at the factory stated that all product in house was shipped down from the Nor-Lake facility in Hudson, Wisconsin.

### i. Defendants' Sale of Counterfeit Products at Partstown.com

87.     Defendants offer replacement parts for the Nor-Lake and Master-Bilt finished products, such as walk-in refrigerators and freezers, for sale at partstown.com. For example:



(From https://www.partstown.com/norlake/nor071603#id=manualsDiagrams) (last accessed October 28, 2024)

88.     Upon information and belief, Defendants are aware that the product image was made from a genuine Kason product.

89.     The use of images of Kason's products in such product listings allows persons familiar with Kason's product line to find the replacement part they need, even if the Kason part number is not used in the listing. Many OEMs other than the Defendants use this Kason hinge on their finished products. Upon information and belief, a user seeking this hinge for a product made by another OEM could

recognize the part from this image and would order it for use on a product not made by Nor-Lake.

90.    Kason ordered two Nor-Lake replacement parts from Parts Town – NOR071603 and NOR083479. Both parts should have been genuine Kason parts, because Kason is the supplier to Defendants for these parts, and Kason holds registered trade dress rights to those products' designs. Instead, the parts that were delivered from Parts Town appeared identical to Kason parts, but did not have the markings showing they were genuine parts.

91.    Specifically, when the NOR071603 product was delivered, it appeared to be a copy of the Kason 1245 Hinge. The delivered product had the same appearance as the Kason product:

Kason 1245 Front        Counterfeit 1245 Front

 

92.    The underside of each item is not the same, however. The genuine Kason item has the company name "Kason®," and the part number (1245). The counterfeit item delivered from the Parts Town website lacks those markings, indicating that the item that was delivered is not a genuine Kason product:




93.    Similarly, when the NOR083479 product was delivered, it appeared to be a copy of the Kason 1248 Hinge. The delivered product has the same appearance as the Kason product:

**Kason 1248 Front**



**Counterfeit 1248 Front**



94.     The underside of each item is not the same, however. The genuine Kason item has the company name "Kason®," and the part number (1248). The counterfeit item delivered from the Parts Town website lacks those markings, indicating that the item that was delivered is not a genuine Kason product:

## Kason 1248 Back          Counterfeit 1248 Back

 

95.     Upon information and belief, Defendants have caused unauthorized copies of the Kason 1245 and Kason 1248 Hinges to be distributed to consumers, either directly or indirectly, by installing those hinges on Defendants' finished products.

96.     Upon information and belief, Defendants have caused unauthorized copies of other Kason products with unique appearances protected by registered U.S. trademarks to be distributed to consumers, either directly or indirectly, by offering those products for sale as replacements parts purchased directly from Defendants, or from distributors such as Parts Town.

97.     Upon information and belief, Defendants have caused unauthorized copies of other Kason products with unique appearances protected by registered U.S. trademarks to be distributed to consumers, either directly or indirectly, by installing those unauthorized copies on Defendants' finished products.

## ii. Defendants' Breach of the Kason NDA

98.     Defendants also have purchased from Kason the locking door latch identified by Kason part No. 921C. Defendants identify that item by the Nor-Lake part number 107916-HANDLE NL9800. *See* https://www.partstown.com/norlake/nor107916. This is also one of the items identified by Defendants as being part of their dual sourcing program.

99.     In December 2023, an employee of RSG requested the "step file" for this item. A step file is a computer-aided design ("CAD") drawing of a manufactured item that can be used for several purposes, including, but not limited to, duplicating that item and providing specifications and other information about the product to assist sales efforts. Kason's employee responded that a signed non-disclosure agreement would be required before Kason would release the step file.

100.    RSG's employee supplied the signed NDA, and Kason provided the step file. A true and correct copy of the signed NDA is attached hereto as Exhibit 4. The NDA expressly states, among other things, that "Customer shall not at any time divulge to others or use for its own purposes" the drawings that Kason

provides and that "Proprietary information is being furnished by Kason with an agreement that it is strictly forbidden to use the information against the best interests of Kason."

101. Upon information and belief, it is likely that Defendants, at minimum, used the drawings "against the best interests of Kason." The proprietary Kason step file can be used in many ways, including setting up the tooling for the factory, as well as making quality control and inspection documents. Using the step file would save Defendants and their new supplier time and money, avoiding the significant cost of creating the drawings, tooling, and other items from scratch.

102. Upon information and belief, Defendants have imported into the U.S. copies of the genuine Kason 921C locking door latch, installed such handles on finished products, offered such finished products for sale, and sold such finished products.

103. In addition, Defendants are offering the counterfeit part for sale at partstown.com using images indicating that the part is a Kason part. First, the product image includes keys bearing the Kason mark, and second, the product image includes a part bearing a Kason patent number, both of which indicate that the part is a genuine Kason part:



(Image from https://www.partstown.com/norlake/nor107916)



(Zoomed images using the viewer and zoom tool at
https://www.partstown.com/norlake/nor107916#sirv-viewer-1300192136443)

104.   Upon information and belief, Defendants have offered for sale and

sold in the U.S. copies of the genuine Kason 921C handle into the replacement

parts aftermarket via Parts Town or other distributors.

### iii. Defendants' Misleading Use of Kason Product Images to Sell Their Counterfeit Products

105.   Defendants also offer replacement parts for Master-Bilt walk-in

refrigerators and freezers for sale at partstown.com:



MASTER-BILT 35-01490 GENUINE OEM REPLACEMENT PART

DOOR CLOSURE

https://www.partstown.com/master-bilt/mb35-01490.

106.    The image of the product is of the genuine Kason 1095 Door Closer.

This part – MB 35-01490 –  also is one of the parts that RSG identified as being

sourced from a party other than Kason.

107. Defendants identified the 1095 Door Closer as one of the items it was dual sourcing. Kason has reason to believe that substitute 1095 Door Closers were manufactured to Defendants' specifications to copy the Kason part.

108. Upon information and belief, Defendants have caused unauthorized copies of the Kason 1095 Door Closer to be distributed to consumers, either directly or indirectly through distributors such as Parts Town, when consumers were led to believe that they would be receiving the genuine Kason 1095 Door Closer depicted in the product advertisement.

109. Upon information and belief, in addition to the Kason 1095 Door Closer, Defendants have caused unauthorized copies of other Kason products with unique appearances protected by registered U.S. trademarks, such as the other dual sourced products, to be distributed to consumers, either directly or indirectly through distributors such as Parts Town, when consumers were led to believe that they would be receiving the genuine Kason product depicted in the product advertisement.

### iv. Defendants' Use and Sale of Additional Counterfeit Products and Products Incorporating Counterfeit Products

110. In addition to the parts obtained from Partstown (the NOR083479 and NOR071603 products, which correspond to the 1245 and 1248 Hinges, respectively, and as discussed *supra*), upon information and belief, Defendants

have engaged in the use and sale of products substantially indistinguishable from the 1246 Hinge, 1249 Hinge, and the 1095 Door Closer and their associated registered trade dress.

111. Kason obtained samples of the 083479 (corresponding to the 1245 Hinge), 071601 (corresponding to the 1246 Hinge), 071603 (corresponding to the 1248 Hinge), 083478 (corresponding to the 1249 Hinge), and 125373 (corresponding to the 1095 Door Closer) from Defendants ("Defendants' Products").

112. A comparison of the Defendants' Products with the Kason registered trademarks reveals that Defendants' Products are identical in appearance to or substantially indistinguishable from Kason's Registered Trade Dress:

| Defendants' Product | Registered Trade Dress | Kason's Part No. |
|---|---|---|
| Hinge - Part No. 071601  | Trademark Reg. No. 2,382,322  | 1246 Hinge |
| Hinge - Part No. 071603  | Trademark Reg. No. 2,415,070  | 1248 Hinge |



| Hinge - Part No. 083478 | Trademark Reg. No. 2,415,066 | 1249 Hinge |
| --- | --- | --- |
| Hinge – Part No. 083479 | Trademark Reg. No. 2,176,043 | 1245 Hinge |
| Door Closer – Part No. 125373 | Trademark Reg. No. 4,906,918<br><br>(Image from U.S. Trademark Registration No. 4,906,918) | 1095 Door Closer |

113.   The Defendants' hinges and door closer are counterfeits. As used in the Lanham Act, the term "counterfeit" means "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The preceding evidence demonstrates that the Defendants' products have the same physical appearance as the registered trade dress designs, and the same physical

appearance as the Kason products that embody those registered trade dress designs. The Defendants' products are identical with, or substantially indistinguishable from, the Kason Marks.

114. At the very least, Defendants' products are sufficiently similar to the Kason marks that the two give rise to a likelihood of confusion as to source or affiliation in violation of the Lanham Act.

115. As detailed above, Defendants feature Kason hardware in their marketing communications that depict those items as being incorporated into Defendants' finished products. Upon information and belief, Defendants have caused unauthorized copies of Kason products with unique appearances protected by registered U.S. trademarks, such as the other dual sourced products, to be installed on Defendants' finished products and distributed to consumers. Those consumers did not receive the Kason hardware that Defendants led them to believe they would receive as part of the finished products.

116. The facts demonstrate that Defendants acted willfully, and with the intent to infringe the Kason Marks when the Defendants acquired and distributed products that are copies of the Kason products that embody the Kason Marks. Those facts include at least the following:

> a. RSG has been trading on the high quality of these hinges and door closer that Kason had been supplying, and RSG continues to do so.

RSG chose to replicate the appearance of the Kason products to ensure that RSG's customer base believed there had been no change in supplier.

b.  Upon information and belief, RSG imported commercially significant quantities of these counterfeit items – thousands of the four hinges and door closers. Also upon information and belief, the vast majority of the hinges were deployed, causing irreparable harm to Kason; any further deployment of the door closers will cause even more harm.

c.  RSG has had notice of Kason's registered IP rights for many years. Yet RSG decided to counterfeit Kason's products anyway. Kason consistently informs the public that these hinges and door closer are protected by registered IP rights. Kason directly informed RSG in at least January 2024, and again in August 2024, that these products were protected by registered IP rights. Kason again informed RSG of its IP rights on October 31, 2024, in its demand letter and filed complaint.

d.  Upon information and belief, RSG continued to import and deploy the counterfeit items after October 31, 2024.

117. The similarity of Defendants' products to the Kason Marks makes them likely to cause confusion on the part of consumers as to the source or affiliation of the products, for at least the following reasons:

a. the Defendants' counterfeit products are identical, or substantially identical, copies of the Kason products that embody the Kason Marks;

b. the Defendants are using their counterfeit versions of Kason's products in exactly the same place and manner as they previously used Kason's genuine products: the counterfeits are installed on walk-in refrigerators and freezers, and are sold as replacement parts to the trade;

c. because of the years-long deployment of the genuine Kason products by the Defendants, the typical purchaser of the Defendants' finished products is not likely to exercise a high degree of care in confirming that the hinges and door closer are actually supplied by Kason, and as long as the parts have the same appearance, the purchaser is highly likely to assume they were supplied by Kason even if they were not;

d. the Kason Marks are strong, as they have been used exclusively by Kason for decades, are registered at the USPTO on the general register, and have achieved incontestable status; and

e. Defendants intentionally are passing off the counterfeit products as those of Kason, as they have continued to use the same promotional content that touts the important contributions of the Kason products to the durability of the doors on their finished products, even after the Defendants substituted the counterfeit products for the genuine Kason products, and, as discussed *infra*, they specified Kason hinges to obtain the Miami-Dade County Notice of Acceptance at the same time that they were sourcing the counterfeit Kason hinges.

## VI. DEFENDANTS' HARMFUL ACTIONS ADVERSELY AFFECT KASON

118. Kason and Defendants are direct and indirect competitors in the commercial restaurant equipment industry, at least for the sales of replacement restaurant equipment parts.

119. As a result of the foregoing, Defendants have been offering to sell, selling, and/or continuing to offer to sell, and/or selling parts not supplied by Kason in ways that infringe some or all of Kason's trademark rights, including the Kason Marks.

120. The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion or mistake, or to deceive consumers, the public, and the trade into believing that copies of Kason parts offered for sale and sold by Defendants are genuine parts supplied by Kason.

121. Each sale by Defendants of the infringing parts is a lost sale for Kason, causing a loss in market share, revenue, and the business opportunities reflected by these measures.

122. In the field of replacement parts, Kason and Defendants market to and try to influence the same group of customers to purchase their wares. But Defendants do so by infringing Kason's intellectual property rights. In addition to lost sales, that infringement harms, and threatens to harm in the future, Kason's reputation for quality and reliability.

123. Numerous factors establish Kason's reputation for quality and reliability, including the fact that it has been in continuous operation for almost 100 years; it supplies hardware to all the major OEMs that compete against the Defendants; and many purchasers of food service equipment specify Kason hardware when designing the refrigerators and freezers to be installed in their establishments.

124. Upon information and belief, the infringing parts are of lesser quality and have not undergone the testing to ensure the high standards of durability that

Kason requires of parts bearing the famous Kason name and other marks, which symbolize Kason's reputation and goodwill. By infringing Kason's intellectual property rights, Defendants unlawfully and without authorization from Kason seek to gain the benefit of Kason's reputation for strict quality standards that Kason's customers have come to recognize through Kason's trademarks.

125. In addition, although its analysis of the infringing parts is ongoing, Kason's examination has confirmed that the RSG parts are of lower quality than the Kason parts. For example, in the strap hinges the zinc content is significantly lower, and the ribbing is significantly thinner. Both factors are known to result in the tendency to break sooner than the genuine Kason product. Lower quality in a counterfeit product will harm Kason's reputation in the marketplace.

126. The facts demonstrate that Defendants engaged in a planned program to continue to represent that its parts were supplied by Kason long after Defendants had substituted the lower quality Defendants' Products for genuine Kason products.

127. Defendants' infringing parts also are deficient and inferior to Kason's parts because, on information and belief, those parts are not NSF (National Sanitation Foundation) certified. *See* Exhibit 5, NSF Search Results for Nor-Lake, https://info.nsf.org/Certified/Food/Listings.asp?TradeName=&CompanyName=nor-lake&PlantState=&PlantCountry=&PlantRegion=&Standard=&search=Search

(none of the infringing Nor-Lake parts are listed); and Exhibit 6, NSF Search

Results for Master-Bilt, https://info.nsf.org/Certified/Food/

Listings.asp?TradeName=&CompanyName=mas&PlantState=WI&PlantCountry=

&PlantRegion=&Standard=007&search=Search  (none of the infringing Master-

Bilt parts are listed).

128.   This lack of certification causes harm because Kason's parts are NSF

certified, and when a customer believes that a part was produced by Kason, they

expect the part to be NSF certified. NSF certification requires compliance with

strict standards and procedures, undergoing extensive part testing and material

analysis to comply with food safety protocols. The Kason parts at issue herein are

NSF certified.

129.   Upon information and belief, the NSF regulations require that for a

finished commercial refrigerator or freezer to be identified as NSF certified, each

hardware component on that product must be certified as NSF compliant.

130.   Upon information and belief, to the extent that Defendants are using

uncertified hardware in place of hardware that had been supplied by Kason and is

NSF certified, Defendants are falsely representing to the consuming public that its

products are NSF certified.

131.   Defendants also have obtained a Notice of Acceptance from the

Miami-Dade County Department of Regulatory and Economic Resources –

Product Control Section covering Walk-in Coolers and Freezers. The Notice of Acceptance is based on a set of engineering drawings describing Nor-Lake products dated July 2023 that expressly specify the Kason 1245 and 1248 hinges – hinges that are protected by the '043 Mark and the '070 Mark:



A true and correct copy of said Notice of Acceptance is attached hereto as <u>Exhibit 7</u>.

132.    Upon information and belief, it is a violation of the Miami-Dade County code to offer for sale, sell, or install within that jurisdiction any walk-in cooler or freezer that has not received such a Notice of Acceptance. Upon further information and belief, it also would be a violation of the Miami-Dade County

code to offer for sale, sell, or install within that jurisdiction any walk-in cooler or freezer and claim that it is covered by a specific Notice of Acceptance if the specified component parts have not been used.

133.   To the extent that Defendants have offered for sale, sold or installed any walk-in cooler or freezer in Miami-Dade County claiming that it is covered by said Notice of Acceptance, and that product contains the counterfeit versions of the Kason 1245 or Kason 1248 hinges, upon information and belief, Defendants have violated the Miami-Dade County code, and also have made material misrepresentations to the purchasing public.

134.   Kason's goodwill also is at risk if Defendants do not stop infringing the Kason Marks. By copying Kason's parts and/or offering those parts as competing parts, Defendants are trading off of Kason's reputation and goodwill as a leading innovator in the field of restaurant equipment components symbolized by Kason's Marks. As a result, Defendants gain a competitive advantage in influencing purchasers of restaurant equipment using Kason's Marks and also unfairly gains a potential foothold in the market with customers, which irreparably harms Kason as the single source of origin for the trademarked Kason parts.

135.   Defendants' infringement further harms Kason because Defendants will unfairly gain entry into the market for restaurant equipment parts using the

Kason Marks, including selling related replacement parts in the future, as well as the aftermarket for repairs, all as a result of Defendants' infringing activity.

136. Kason's OEM customers purchase and incorporate Kason's parts into the products they manufacture, including commercial restaurant equipment. After the passage of time, the customers will often need replacement parts and aftermarket repairs. As would be expected, those customers turn to Kason.

137. Once a customer has made investments of time, energy, and resources into choosing certain hardware and parts from one manufacturer, and has confirmed that the finished part meets all applicable codes and desires, the customer is reluctant to change manufacturers and/or parts and, as a consequence, it becomes very difficult for another manufacturer to sell competing hardware to the customer. Additionally, once a piece of hardware is installed and in use, the hardware manufacturer gains the intangible benefit of beginning to build a stronger relationship with the end users who become familiar with the hardware through actual day-to-day use.

138. For these reasons, Kason commonly invests a substantial amount of time, energy, and resources into developing, patenting, certifying, registering, marketing, and selling new parts, with the reasonable expectation that there will be a substantial return on its investments as the new parts emerge in the marketplace, and as replacement parts and repairs are needed. As a result, once Defendants

misuse, for example, the appearance of the non-Kason Hinge to convince a customer to order parts from Defendants instead of Kason, the consumer and Kason are immediately and irreparably harmed. The consumer is likely to receive an inferior product, including missing out on Kason's continued efforts to improve its products. Kason's reputation is then harmed when the consumer associates the lower quality product with Kason, because the product is designed to mimic the unique appearance of the Kason product.

139.   The same results also can arise if the manufacturer that made the counterfeit parts for Defendants successfully markets those parts to Kason's other OEM customers. Kason's hardware parts, including those with unique appearances that are protected by registered U.S. trademark protection, are used by multiple OEMs on their finished products. Those OEMs are prime targets for the sale of counterfeit parts that allow the OEMs to circumvent Kason as the sole legitimate supplier of these hardware products.

140.   Kason invested substantially in developing, patenting, trademarking, creating, achieving and maintaining NSF certification, improving, and marketing its parts. By doing so, Kason created a demand for the parts represented by the Kason Marks among customers and others in this market. Kason reasonably expected the trajectory of its development, marketing, and sales efforts and investments to result in sales to many different customers and at prices

commensurate with its market position for these parts, and with gaining positive goodwill and reputation for its parts and features, and with additional business opportunities flowing therefrom because Kason had an early foothold in the emerging market for its branded parts.

141.   Defendants also have harmed Kason by causing the tooling up of one or more factories to make some or all of these counterfeits. Those factories can be expected to offer those parts to other Kason competitors or customers, thereby setting up a continuing threat of future manufacture, importation, and sales of counterfeit parts by parties other than the Defendants.

142.   Even if no new tooling was required to make the counterfeit parts, because of their status as major OEM marketplace participants, RSG has demonstrated to the supplier community the available demand for counterfeit products, and the possible supply of counterfeits to Kason's current and potential customers.

143.   Monitoring for these products being imported and marketed will cost Kason tens of thousands of dollars each year as long as it is in business. Taking legal action to stop counterfeiting when it occurs will cost Kason hundreds of thousands of dollars in legal fees, as long as it is in business.

144.   The importation and deployment of such counterfeits that RSG performed itself, and the future counterfeiting that RSG has incentivized, has

deprived and will deprive Kason of its profits for the sales to RSG and other OEMs for initial installation, and of the value of the aftermarket replacement sales.

145. As a result of Defendants' actions, Kason has or will suffer price erosion, loss of goodwill, damage to reputation, future damages from lost sales of replacement parts and equipment repair, and loss of other business opportunities. As a result, Kason has been and will continue to be irreparably harmed by Defendants' actions.

### COUNT I
### (Trademark Counterfeiting and Infringement – 15 U.S.C. § 1114)

146. Kason restates and incorporates the averments set forth in the above paragraphs as if fully set forth herein.

147. The Kason Marks and the goodwill of the business associated with them in the United States and throughout the world are of great and incalculable value, are highly distinctive, and have become universally associated in the minds of the purchasers of foodservice equipment hardware with Kason's parts and related services of the very highest quality and reputation.

148. Defendants have manufactured, imported into the United States, distributed, offered for sale, advertised, and/or marketed parts to the consuming public using a counterfeit product and/or in direct competition with Kason's provision of goods under the Kason Marks, in or affecting interstate commerce.

149.    Defendants' products are substantially indistinguishable in appearance from Kason's registered marks. They are virtually identical in appearance to Kason's registered marks and are therefore properly considered to be counterfeits.

150.    The consumers purchasing these parts are often sophisticated consumers, however, because they are initially purchased as part of a larger product, and because the appearance of Defendants' products, when installed, is virtually identical to that of a Kason product, consumers will not readily know that they have not purchased a genuine Kason product.

151.    Kason's registered trade dress is strong and has achieved incontestable status.

152.    Defendants acted without Kason's authorization or consent, and with knowledge of Kason's well-known and prior rights in the registered Kason Marks. Despite that knowledge, Defendants' parts are intentionally confusingly similar to and/or substantially indistinguishable from, the Kason Marks.

153.    Defendants made a conscious choice to copy the Kason Marks and develop its infringing products, rather than obtaining alternative, non-infringing products. Defendants have used Dent brand hinges on Master-Bilt products; rather than using Dent's non-infringing hinges on its products, Defendants opted to instead create knock-offs of the Kason hinges.

154. By their sales and use of copies or confusingly similar versions of the Kason Marks in conjunction with selling and advertising Defendants' goods, Defendants are likely to cause, and are causing, confusion, mistake, and deception among the general purchasing public as to the origin of Defendants' goods, and are likely to deceive the public into believing the goods being promoted and sold by Defendants bearing the Kason Marks originate from, are associated with, or are otherwise authorized by Kason, all to the damage and detriment of Kason's reputation, goodwill, and sales.

155. Defendants' use of the Kason Marks also is likely to cause, and is causing, confusion, mistake, and deception among the restaurant equipment selling community and purchasing public, many of whom are small business owners, as to the origin of related goods using the Kason Marks, and is likely to deceive that public into believing that Defendants' parts are related goods that originate from, are associated with, or are otherwise authorized by Kason, all to the damage and detriment of Kason's reputation, goodwill and sales.

156. Kason has been and will continue to be harmed by Defendants' wrongful conduct.

157. In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Defendants' aforesaid acts,

Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

158.   As the direct and proximate result of Defendants' deliberate and intentional infringement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained, including future damages from lost sales of replacement parts and equipment repair services.

159.   Kason is entitled to treble damages, attorneys' fees, and/or statutory damages for Defendants' use of counterfeit marks pursuant to 15 U.S.C. §§ 1117(a), (b), and (c).

160.   For Kason to recover such damages, Defendants need not know that the marks being used are federally registered trademarks.

161.   Kason also is entitled to injunctive relief, as detailed in 15 U.S.C. § 1116, including seizure of goods bearing counterfeit marks under § 1116(d), and destruction of the infringing articles pursuant to 15 U.S.C. § 1118.

## COUNT II
## (Unfair Competition and False Designation of Origin – 15 U.S.C. § 1125(a))

162.   Kason restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

163. The products sold and offered for sale by Defendants are virtually identical in appearance to the Kason Marks.

164. The products sold and offered for sale by Defendants are of the same nature and type as the goods and services sold and offered for sale by Kason and, as such, Defendants' use is likely to cause confusion to the general purchasing public, and to the restaurant equipment purchasing public. By misappropriating and using the Kason Marks, Defendants misrepresent and falsely describes to the general public and to the purchasing community the origin and source of the goods bearing the Kason Marks and create a likelihood of confusion by consumers and by the purchasers of parts as to the source of such goods and services.

165. Defendants' actions constitute a false designation of origin, sponsorship, approval, or certification, and a false description or representation of fact, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

166. Because of Kason's open and widespread use of the Kason Marks in the promotion of Kason's business which competes with Defendants' businesses, and in light of Kason's business relationship with Defendants for sales of genuine parts bearing the Kason Marks, Defendants' use of the Kason Marks is with knowledge and in willful disregard of Kason's rights therein.

167. Kason has been and will continue to be harmed by Defendants' wrongful conduct.

168. As the direct and proximate result of Defendants' deliberate and intentional infringement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained.

169. In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Defendants' aforesaid acts, Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

## COUNT III
## (Common Law Trademark Infringement)

170. Kason restates and incorporates the averments set forth in the above paragraphs as if fully set forth herein.

171. As a result of Kason's hard work and investments in producing, providing, and promoting its parts associated with the Kason Marks, all of which occurred long before Defendants began marketing and selling the parts that infringe, Kason has built up valuable goodwill in the Kason Marks. As such, the Kason Marks have become associated with Kason's parts and services and have come to symbolize the reputation for quality and excellence of the Kason parts and services.

172.   Defendants' unauthorized use of the Kason Marks is being made with Defendants' knowledge of Kason's well-known and prior rights in the Kason Marks.

173.   Defendants' unauthorized use of the Kason Marks is likely to cause confusion or to deceive the consuming public and the purchasers of restaurant equipment and constitutes trademark infringement under the common law of the State of Wisconsin, and the laws of the United States.

174.   Defendants' acts constitute willful infringement of Kason's exclusive rights in the Kason Marks , in violation of state common law.

175.   Kason has been and will continue to be harmed by Defendants' wrongful conduct.

176.   In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Defendants' aforesaid acts, Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

177.   As the direct and proximate result of Defendants' deliberate and intentional infringement, Kason continues to suffer injury in an amount not yet ascertained.

## COUNT IV
## (Wisconsin Deceptive Trade Practices Act Wis. Stat. § 100.18)

178.   Kason restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

179.   As a result of Kason's hard work and investments in producing, providing, and promoting its parts associated with the Kason Marks , Kason has built up valuable goodwill in the Kason Marks . As such, the Kason Marks have become associated with Kason's parts and services and have come to symbolize the reputation for quality and excellence of the Kason parts and services.

180.   Defendants, with full knowledge of the Kason Marks and of Kason's prior use of same, intended to and did trade on the goodwill associated with the Kason Marks.

181.   Specifically, Defendants have misleadingly represented that their counterfeit products are Kason's proprietary products by using Kason's registered trade dress and, in at least one case, by using photos of the Kason product to sell its counterfeit products.

182.   Defendants' acts have misled and continue to mislead and deceive the public as to the source of the goods and services offered by Defendants, permit and

accomplish passing off of the goods offered by Defendants as those of Kason, and falsely suggest a connection with Kason.

183.    Therefore, Defendants have committed unfair competition and engaged in deceptive trade practices in violation of Wisconsin law Wis. Stat. § 100.18.

184.    Kason has been and will continue to be harmed by Defendants' wrongful conduct.

185.    In light of Kason's significant and longstanding investment in building its parts' reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Defendants' aforesaid acts, Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

186.    As the direct and proximate result of Defendants' deliberate and intentional infringement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained.

## COUNT V
### (Common Law Breach of Contract)

187.    Kason restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

188.   On November 27, 2023, Defendant RSG entered into a "Customer Non-Disclosure Agreement CAD Models and Drawings" ("the Agreement') wherein RSG agreed that it "shall not at any time divulge to others or use for its own purposes any of the confidential proprietary, or trade secret information loaned by Kason Industries unless authorized to do so in writing by Kason Industries," nor shall it "use the information against the best interests of Kason."

189.   Pursuant to this Agreement, Kason furnished RSG with a CAD drawing.

190.   Kason did not provide any authorization to divulge the confidential information provided to RSG or to use that information to for any other commercial purpose that was not supporting Kason.

191.   Upon information and belief, Defendants used the CAD drawing to facilitate the manufacture a copy of the 921C part, against the best interests of Kason.

192.   Defendant RSG's breach of the Agreement has harmed Kason by enabling Defendants to sell knock-offs of Kason's proprietary designs.

193.   Defendants have irreparably harmed Kason in ways not readily compensated by monetary damages, and will continue to irreparably harm Kason in this manner unless enjoined by the Court, as a result of which Kason is without adequate remedy at law.

194.    As the direct and proximate result of Defendants' deliberate and intentional breach of the Agreement, Defendants have been unjustly enriched while Kason continues to suffer injury in an amount not yet ascertained.

## JURY DEMAND

195.    Plaintiff demands a trial by jury on all disputed issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a judgment in its favor and demands the following relief:

1.    A preliminary injunction and a permanent injunction enjoining Defendants, their successors or assigns, and their officers, directors, partners, agents, subcontractors, servants, employees, attorneys, affiliates, licensees, divisions, subsidiaries and related entities, and all others acting in concert or participation with Defendants, from doing any of the following:

   a.  Displaying, marketing, importing, making, offering for sale or selling any unauthorized copy of any item embodying the Kason Marks, or any such similar mark,

   b.  Displaying, marketing, any unauthorized copy of any item embodying the Kason Marks, or any such similar mark, to advertise, promote the sale of, or to identify any part or service offered by Defendants;

c. Making, in any manner whatsoever, any statement or representation, or performing any act likely to deceive members of the public about the origin of genuine or non-genuine Kason parts marketed and sold by Defendants;

2.     A decree ordering an accounting by Defendants to establish all profits realized as a result of the wrongful acts by Defendants set forth in this Complaint, and any other wrongful acts by Defendants to be set forth at trial;

3.     Judgment finding that Defendants have willfully infringed Kason's protectable trademarks;

4.     Judgment against Defendants specifically including, but not limited to the following, to the extent allowed by law (including, but not limited to, 35 U.S.C. §§ 281-285, 15 U.S.C. §§ 1114, 1116(d), 1117, 1118, and 1125; trademark common law; and Wis. Stat. § 100.18):

a. actual monetary damages sustained by Plaintiff, or, in the alternative, statutory damages where such are authorized, including but not limited to $2,000,000 per counterfeit mark per type of good sold, offered for sale, or distributed for the willful counterfeiting by Defendants;

b. seizure and destruction of all counterfeit products embodying the Kason Marks, including the means of making such marks, and

records documenting the manufacture, sale, or receipt of things involved in such violation;

c. profits unlawfully earned by Defendants as a result of the unlawful acts;

d. exemplary, punitive, and treble damages where such are authorized by law;

e. costs and prejudgment interest;

f. attorneys' fees; and

g. Such other and further relief as the Court deems appropriate and just under the circumstances.

Dated: February 12, 2025     Respectfully submitted,

QUARLES & BRADY LLP

*/s/ Matthew J. Duchemin*
Matthew. J. Duchemin
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
Facsimile: (608) 251-9166
matthew.duchemin@quarles.com

EVERSHEDS SUTHERLAND (US) LLP
Ann G. Fort
GA Bar No. 269995
Anna C. Halsey
GA Bar No. 208034
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Telephone: (404) 853-8000

Facsimile: (404) 853-8806
annfort@eversheds-sutherland.com
annahalsey@eversheds-sutherland.com

*Attorneys for Kason Industries, Inc.*

## <u>VERIFICATION</u>

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the

statements of fact in the foregoing Verified Complaint are true and correct.

This 12 day of February, 2025.

Brian Holdrich
Vice President of Sales and Marketing
Kason Industries, Inc.